**THIRD NATIONAL BANK IN NASHVILLE, Plaintiff,**

v.

**HARDI–GARDENS SUPPLY OF ILLI-NOIS, INC., et al., Defendants.**

**Civ. A. Nos. 6881–6885.**

United States District Court,
M. D. Tennessee,
Nashville Division.

July 15, 1974.

As Amended Aug. 9, 1974.

Thomas P. Kanaday, Jr., Nashville, Tenn., for plaintiff.

John T. Conners, Jr., Robert J. Walker, Vaden M. Lackey, Jr., Nashville, Tenn., for defendants.

## MEMORANDUM

MORTON, District Judge.

These causes were consolidated for trial and came on to be heard without a jury on the 27th day of September, 1973. The Court having heard the evidence, considered the pleadings and stipulations filed herein, and the briefs and arguments of counsel, finds:

## I. FINDINGS OF FACT

### A. *Jurisdiction*

1. The jurisdiction of the Court is admitted with respect to all notes except those made by Garlawn Corporation. Garlawn Corporation and the individual guarantors of its debt insist (1) that its notes and franchise agreement were signed in Illinois and that, accordingly, Tennessee courts have no basis for exercising in personam jurisdiction, and (2) that, as to the individual guarantors of the Garlawn notes, the aggregate indebtedness does not exceed $10,000.00 so that there is no basis for jurisdiction under 28 U.S.C.A. § 1332.

2. There is conflicting testimony as to the place of the execution of the Garlawn notes. The former Chairman of Hardi-Gardens testified that, in accordance with established company policy, the notes were executed in Nashville, Tennessee. Two of the guarantors testified that the notes were signed in Illinois.

3. The Garlawn notes arose out of an earlier series of transactions in which the principals of Garlawn had procured Hardi-Gardens franchises for another company which they controlled. Undisputedly, prior to execution of the Garlawn notes, certain of the guarantors had visited Hardi-Gardens in Nashville to familiarize themselves with the Hardi-Gardens operation. It is admitted that the Garlawn franchise agreement was not signed by Hardi-Gardens until it was delivered to Nashville by one of

the co-guarantors. This co-guarantor was at that time a Tennessee resident.

4. The Garlawn franchise agreement expressly requires representatives of Garlawn to attend training sessions. Such sessions were held at the Hardi-Gardens headquarters in Nashville. Subsequent to the execution of the Garlawn notes, Hardi-Gardens employed one of the co-guarantors to work in Nashville and in the Chicago area in connection with Hardi-Gardens' site selection and construction.

5. Each note specifically states that it is payable in Nashville, Tennessee. Each note bears the notation of "Nashville, Tennessee" in its heading, thereby indicating the place of execution. In the Garlawn franchise agreement we find the following stipulation:

Article 31. It is stipulated that this Agreement *has been negotiated in, and finally executed within* the State of Tennessee, and shall be construed according to the laws of that state.

6. The aggregate principal indebtedness of each Garlawn guarantor was $10,800.75. Each Garlawn note bears interest at the rate of 6% from maturity and provides for the payment of an attorney's fee. Prior to the filing of this action, the guarantors had repudiated the Garlawn debt in its entirety. At the time of the filing of this suit the principal debt then due and owing by each guarantor was $8,640.60 plus attorney's fees.

B. *The Loan to Hardi-Gardens*

1. Hardi-Gardens was organized in 1968 as successor by merger with Garden Centers which had been a subsidiary of E. K. Hardison Seed Co. Hardi-Gardens, like Garden Centers, was engaged in the operation and franchising of retail garden centers. E. K. Hardison Seed Co. had a long standing relationship with Bank and had, from time to time, pledged and discounted notes receivable to Bank.

2. Hardi-Gardens was expanding rapidly and its operations were optimistically assessed during the franchising boom of 1969 and 1970. It had been contemplated that Hardi-Gardens would raise additional capital by a public offering of common stock. The offering was delayed due to a change of its accountants and accounting principles. Due to a precipitous market decline, the public offering was deferred indefinitely and the company decided to make arrangements with a bank for short term working capital to finance the continuing expansion of its franchising operation.

3. After its organization in 1968 and prior to the end of 1969, Hardi-Gardens was indebted to Third National Bank (Bank) on several occasions for relatively small amounts. At the end of 1969 Hardi-Gardens was not indebted to Bank. On February 11, 1970, Hardi-Gardens borrowed from Bank $170,000.-00 and furnished Bank with projections indicating that additional short-term borrowing would be necessary during the year. Initially, it was anticipated that Hardi-Gardens would require approximately $370,000.00 in short term working capital loans to be secured by all notes receivable held by the Company, which amount the Bank agreed to lend. The notes which were pledged arose out of the Company's principal business activity, i. e., the sale of franchises.

4. Bank agreed to accept the notes as collateral as it frequently did from other borrowers. It is clear that for those companies which normally take notes and whose borrowings are such as to require collateral, it is the normal practice for banks to take notes receivable as collateral.

5. The Hardi-Gardens debt to Bank continued to increase and the highest amount of indebtedness owed by Hardi-Gardens to Bank was $764,000.00. On March 6, 1970, when defendants' notes were pledged, Hardi-Gardens was in-

debted to the Bank for $270,000.00. On December 8, 1972, when Bank foreclosed on notes held as collateral, Hardi-Gardens was indebted to Bank for $745,000.00. Subsequent to the foreclosure the indebtedness was reduced by the following credits: $25,000.00 paid on guaranty by Earl Snead; $25,000.00 paid on guaranty by Samuel B. Neal; and $20,000.00 from proceeds of a certificate of deposit held as collateral. At the foreclosure sale, the Bank was the highest and best bidder, paying the aggregate sum of $85,000.00 for all notes then held by it as collateral. No other sums have been received by Bank in payment of the Hardi-Gardens debt. Defendants erroneously assert that $250,000.00 was paid to Bank on the Hardi-Gardens debt on March 22, 1972. There is no basis whatsoever in the record for this assertion which apparently results from a misreading of certain records in which it is indicated that such a sum was "charged off" on March 22, 1972.

## C. *The Hardi-Gardens Collateral*

1. It was agreed that the Hardi-Gardens debt would be collateralized and Hardi-Gardens offered Bank as collateral all the notes it held. On Friday, March 6, 1970, Curtis Carlson, who was Hardi-Gardens' Executive Vice President for Finance, personally brought Bank, as collateral, notes made to Hardi-Gardens by the following persons: Chandler & Denton; Carlson; Palmer, Trowbridge & Sanford; Buckerfield's Ltd.; HGT Corporation; Hardi-Gardens Supply of Texas; Evans; Glenn; Anderson; Myers, Engelbrecht; Garlawn & Hardi-Gardens Supply of Illinois. Mr. Carlson had been authorized by the Board of Directors of Hardi-Gardens to pledge these notes. Two of the Carlson notes, one of HGT Corporation and one of Hardi-Gardens Supply of Texas, were obviously non-negotiable instruments.

2. With regard to the defendants in these cases, the following notes were pledged on March 6, 1970:

| Maker | No. of Notes | Principal Amt. of Each Note | Total Amt. of Prin. Debt. | Maturities |
|---|---|---|---|---|
| Engelbrecht | 4 | $9,875.00 | $39,500.00 | 3–30–71 to 12–30–72 |
| Myers | 6 | $9,875.00 | $59,250.00 | 4–24–70 to 10–24–72 |
| Garlawn Corp. | 5 | $9,875.00 | $49,375.00 | 6–12–71 to 6–12–73 |
| Hardi-Gardens Supply of Ill., Inc. | 6 | $9,875.00 | $59,250.00 | 6–30–70 to 12–31–72 |

Each of the above-described bears interest at 6% per annum after maturity and provides for a reasonable attorney's fee.

3. All of the notes were regular on their face, contained an unconditional promise to pay a sum certain in money to the order of the payee on or before a fixed date. The Garlawn Corporation notes contain the statement "This note is executed pursuant to the terms of a certain Master Franchise Agreement dated 12th day of May, 1969 by and between the Payee as Franchisor and the undersigned as Franchisee."

4. Each note of Garlawn contains the limited guaranty of the following persons:

| | Guaranty Per Note |
|---|---|
| Lawrence J. McNally | $2,160.15 |
| Ronald T. Schaefer | $2,160.15 |
| Arnold D. Kincaid | $2,160.15 |
| Gerald E. McNally | $2,160.15 |
| Thomas Monfre | $1,234.40 |

5. On behalf of Hardi-Gardens, Carlson endorsed each of the notes and pledged them under a "General Collater-

al Agreement" dated March 6, 1970 to secure all present and future indebtedness of Hardi-Gardens. The aggregate principal amount of notes initially pledged under the General Collateral Agreement was $1,396,325. The Hardi-Gardens debt to Bank was also secured by the pledge of a certificate of deposit in the amount of $20,000.00 pledged under a General Collateral Agreement, dated February, 1970.

6. After the notes were endorsed and after the General Collateral Agreement was signed, they were taken to the Bank's collateral department for safekeeping. The collateral department verified the collateral and issued a receipt dated March 9, 1972. The stamped notation "non-neg" on the collateral indicates the place in Bank's vault where the notes were stored and does not indicate any judgment by the collateral department as to the negotiability of the collateral.[1]

7. Prior to the pledge of notes, Frank McCoy, Chairman of Hardi-Gardens, had a discussion with John Clay, then an executive vice president of Bank, in which he informed Clay about the financial strength of the makers of the notes and the schedule of maturities of the notes. The Bank understood that the notes had been made in partial payment for franchise fees. In connection with the proposed loan transactions, on January 8, 1970, Bank received a copy of the Hardi-Gardens financial statement for the fiscal year ended June 30, 1969. The Bank relied upon this statement in making the loan to Hardi-Gardens. Note D to this financial statement discusses the character of the notes then held by Hardi-Gardens: "[t]he corporation receives a series of non-interest bearing notes as partial payment for each master franchise sold." These financial statements, certified by Ernst & Ernst, do not disclose any contingencies or defenses with respect to the payment of the notes.

8. The franchise agreements were not attached to the notes and at the time of the pledge the Bank had not been furnished with copies of any franchise agreements.

9. John S. Bransford, who served as a director of both Hardi-Gardens and Bank was not in any way involved in the credit transaction of March 6, 1970 between Bank and Hardi-Gardens. At that time, Bransford had no knowledge of any facts or circumstances which would cause him to believe that there was any defense to the payment of the Hardi-Gardens notes.

10. On December 31, 1970, Bank released $39,500 of notes made by R. P. Evans and received $49,375 of notes made by Pro-Trim. On January 12, 1971, Bank released $266,625 of notes made by Dumon Anderson and received $242,925.00 notes made by Pro-Trim and $29,625.00 notes made by A. C. Lindsey. These were the last changes in the Hardi-Gardens collateral and were evidenced by a new General Collateral Agreement, dated January 19, 1971. The old general collateral agreements were retained in the Bank's files. At no time did Bank release any of the notes made by any of the defendants. There is no credible proof that the above-described releases inured to the detriment of these defendants.

11. No payments were made on any of the notes pledged by Hardi-Gardens to Bank so that the full principal amount of each note, plus interest and a reasonable attorney's fee is due and owing on each note.

12. After Hardi-Gardens defaulted in the payment of its debt to Bank, the Bank on December 8, 1972 sold all the pledged notes at public sale. Bank was the highest bidder on all the notes and, accordingly, purchased the following notes for the indicated prices: D. R. Myers notes, $6,000; Edgar C. Engelbrecht notes, $4,000; Hardi-Gardens of

1. A fair appraisal of the evidence indicates that the notation "non-neg" distinguished the notes from instruments which were in effect bearer instruments and could be negotiated by delivery without endorsements.

Illinois, $6,000; Garlawn Corp., $5,000. The total purchase price paid by Bank for all notes was $85,000.00.

13. In summary, during the period of rapidly expanding franchising, the plaintiff Bank acquired as collateral for loans all of the notes of Hardi-Gardens, a franchise company, which arose out of the sale of franchises. The Bank anticipated that the loan would be for short term working capital.

The Bank had knowledge of the following facts:

(a) There was a franchising arrangement between Hardi-Gardens and the makers of the notes.

(b) There might be accelerated payments of the notes on the sale of sub-franchises by the makers.

(c) The notes arose from the franchising arrangement.

(d) If all notes taken as collateral had been examined, certain notes on their faces were non-negotiable instruments. However, the responsible Bank official did not make such examination.

(e) Bank was furnished financial statements of the makers and was assured by Hardi-Gardens that all notes were collectible.

(f) Bank was not furnished a copy of any franchise agreement and was not aware of its contents.

(g) Hardi-Gardens acquired through merger a tax loss credit.

## II. STIPULATION

It is stipulated that if Bank is not a holder in due course of the notes on which this action is brought, the defendants have valid defenses to the payment of the notes and that Bank is subject to those defenses.

## III. CONCLUSIONS OF LAW

### A. *In Personam Jurisdiction*

1. The Tennessee Long Arm statute T.C.A. § 20–235 expressly provides that non-residents are subject to the jurisdiction of Tennessee courts as to any claim for relief arising from the transaction of any business within the state.

■■ 2. The Tennessee Long Arm Statute is in the nature of remedial legislation and it is the legislative intent that it be given a liberal construction. T.C.A. § 20–240. It has been held that this legislation is intended "to exercise the power of the State fully, that is, to the extent allowed under the provisions of the Fourteenth Amendment, but no further." Hamilton National Bank of Chattanooga v. Russell, 261 F.Supp. 145 (E.D.Tenn.1966). In effect, the Tennessee Long Arm statute embraces those standards set by Chief Justice Stone in International Shoe Co. v. State of Washington, 326 U.S. 310, 315, 66 S.Ct. 154, 158, 90 L.Ed. 95:

> Due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.

■ 3. The so-called minimum contacts theory defies precise definition. As the Supreme Court has said, the application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its law. Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283. The doing of an act or the causing of a consequence in the forum state, thus invoking the benefits and protections of its law, will satisfy the requirements of the minimum contact test. Southern Machine Co. v. Mohasco Industries, 401 F.2d 374 (6th Cir. 1968).

4. The mere fact that a note was signed or guaranteed outside the State of Tennessee does not, of itself, denude this Court from exercising its constitu-

tional powers over the maker and the guarantor. This is settled in the case of Hamilton National Bank of Chattanooga v. Russell, *supra,* 261 F.Supp. at 149, in which Judge Wilson said:

"that a defendant did not perform a physical act within the State of Tennessee is not determinative of his or her lack of 'minimum contact', for activities outside the state resulting in consequences within the state may subject those involved in such activities to in personam jurisdiction of the courts of the state."

5. While there is a dispute as to the place in which the makers and the guarantors executed the Garlawn notes and the franchise agreement, it is undisputed that the franchise agreement was not signed by Hardi-Gardens until it was returned to Nashville, Tennessee. As to a third party, such as Bank, who had no knowledge of the transaction, it is only just and fair that the parties to the instruments be bound by the recitation of "Nashville, Tenn." in the heading of the note, thereby indicating place of execution. Nor can the parties escape the provision that each note is payable in Nashville, Tennessee. Similarly, the franchise agreement states that "this Agreement has been negotiated in and finally executed within the State of Tennessee."

6. Bearing in mind the foregoing physical contacts by the maker and the guarantors in various Tennessee transactions, along with the recitations on the face of the notes and the franchise agreement concerning place of execution and place of payment, this Court is compelled to conclude that the maintenance of this suit against the non-resident defendants does not offend traditional notations of fairplay and substantial justice. Hamilton National Bank of Chattanooga v. Russell, *supra.* See also Doyn Aircraft, Inc. v. Wylie, 443 F.2d 579 (10 Cir. 1971). It follow that this Court does have in personam jurisdiction over the defendant Garlawn and over the individual guarantors of its debt.

**B.** *Diversity Jurisdiction*

1. The individual defendants in the Garlawn case assert that because only the principal amount of $8,640.60 was actually owed by each guarantor, there is not the requisite amount of $10,000 in controversy so as to confer diversity jurisdiction on this Court.

2. To justify dismissal for want of the jurisdictional amount, "it must appear *to a legal certainty* that the claim is really for less than the jurisdictional amount, or that the plaintiff never was entitled to recover the amount claimed." 1 J. Moore, Federal Practice, ¶ 0.92[1] (2d 1974). The amount actually recovered will not retroactively affect jurisdiction where the amount set out in the complaint was asserted in good faith. A court should not confuse the determination of its jurisdiction with an adjudication on the merits of the validity of the amount claimed. *Id.*

3. The plaintiff has alleged that at the time of the filing of this suit each Garlawn guarantor was indebted to it for the sum of $10,800.75, i. e., at least $8,640.60 was owing by the terms of four notes and $2,160.15 was owing by reason of the anticipatory breach of a fifth note. Prior to and at the time of the Bank's foreclosure on the Garlawn notes, the guarantors unequivocally repudiated any liability thereunder. In Tennessee it has long been held that where the acts and conduct of a party evidence an intention no longer to be bound by contract, the other party may treat the contract as broken and sue at once for the breach without waiting for the time fixed for performance. Church of Christ Home for Aged v. Nashville Trust Co., 184 Tenn. 629, 202 S.W.2d 178 (1947). Accordingly, we find that plaintiff's claim to $10,800.75 as to each guarantor was made in good faith and that the requisite jurisdictional amount is present.

4. There is a second reason for finding that the amount in controversy exceeds $10,000, exclusive of interest and costs. Each Garlawn note provides

for the payment of reasonable attorneys fees incurred in the collection of the note. It is settled that where "plaintiff can in good faith claim a contractual right to his attorney's fees, even though that right is disputed by the defendant, the amount thereof may be included in determining the amount of controversy . . . ." 1 J.Moore, Federal Practice, ¶ 0.99[2]. See also Springstead v. Crawfordsville State Bank, 231 U.S. 541, 34 S.Ct. 195, 58 L.Ed. 354 (1913). An attorney's fee of 20% of $8,640.60 would cause the amount in controversy to exceed $10,000; and under the complicated and heavily disputed circumstances of this case, plaintiff is well within the bounds of good faith in claiming such a fee.

### C. *Negotiability of the Notes*

1. Defendants assert that the notes are not negotiable instruments because (1) certain of the pledged notes referred to the franchise agreement and (2) the franchise agreements provide for accelerated payment of the notes due to the sale of subfranchises. In order for a note to be a negotiable instrument, it must contain an unconditional promise to pay. T.C.A. § 47–3–104(1)(b).

 2. Apparently defendants believe that payment of all of the notes is rendered conditional because certain notes refer to separate franchise agreements. The notes of Myers, Engelbrecht, and Hardi-Garden Supply of Illinois contain no reference whatsoever to a franchise agreement or to any other agreement. There is no basis for inferring that the Bank had cause to believe that payment of these notes was conditioned by the terms of a separate agreement. If the payment of these notes was conditioned upon the terms of a separate agreement, the notes could and should have stated this condition.

 3. The notes of Garlawn do refer to a franchise agreement, stating merely:

This note is executed pursuant to the terms of a certain Master Franchise Agreement dated the 12th day of May, 1969 by and between the Payee as Franchisor and the undersigned as Franchisee.

Clearly, under the Uniform Commercial Code, T.C.A. § 47–3–105(1)(c), the fact that the note is payable "pursuant to the terms" of a specified agreement does not render payment conditional upon performance of the designated agreement. The Code states, without ambiguity, that a promise to pay is not made conditional by the fact that the note "refers to or states that it arises out of a separate agreement." See also Bigham & White, Tennessee Practice Uniform Commercial Code Forms, § 3–105– Form 1 (1967) in which it is stated that payment of a promissory note is not rendered conditional by including the following statement of the origin of the note: "this note is issued pursuant to the terms and provisions of a contract . . . dated . . . ." The official comments to the code explain that "such language is intended as a mere recital of the origin of the instrument and a reference to the transaction for information, but is not meant to condition payment according to the terms of any other agreement." All doubt as to the status of a subsequent purchaser is removed by T.C.A. § 47–3–119 in which it is stated that "a holder in due course is not affected by any limitation of his rights arising out of the separate written agreement if he had no notice of the limitation when he took the instrument." The Official Comments to this section of the U.C.C. explain that:

Under this Article, a purchaser of the instrument may become a holder in due course although he takes it with knowledge that it was accompanied by a separate agreement, if he has no notice of any defense or claim arising from the terms of the agreement. If any limitation in the separate writing in itself amounts to a defense or claim, as in the case of an agreement that the note is a sham and cannot be enforced, a purchaser with notice of it cannot be a holder in due course. The section also covers limi-

tations which do not in themselves give notice of any present defense or claim, such as conditions providing that under certain conditions the note shall be extended for one year. A purchaser with notice of such limitations may be a holder in due course, but he takes the instrument subject to the limitation. If he is without such notice, he is not affected by such a limiting clause in the separate writing.

As more fully discussed under the heading of "Notice", we find that as of the date of the pledge March 6, 1970, the Bank had no notice of any claim or defense to the payment of the notes.

 4. Defendants have emphasized that the franchise agreements provide for accelerated payment of the notes upon the sale of franchises prior to the stated maturity of the notes. It should be sufficient to note that at the time of the pledge Bank had no notice of the terms of the franchise agreements. Nevertheless, the Code states with clarity that "a promise . . . is not made conditional by the fact that the instrument . . . refers to or states that it arises out of a separate agreement, or refers to a separate agreement for rights as to pre-payment or acceleration." T.C.A. § 47–3–105(1)(c). While T.C.A. § 47–3–104(1)(c) requires that a negotiable instrument must be paid at a definite time, the code expressly says that an instrument is payable at a definite time if by its terms it is payable "at a definite time subject to any acceleration." T.C.A. § 47–3–109(1)(c).

5. Accordingly, we find that the notes upon which these suits are based contain unconditional promises to pay a sum certain at a definite time so that each note is a negotiable instrument within the meaning of T.C.A. § 47–3–104(1).

D. *Bank's Status as a Holder in Due Course*

1. The Uniform Commercial Code, T.C.A. § 47–3–302, succinctly states the elements of a holder in due course as follows:

A holder in due course is a holder who takes the instrument:

(a) for value; and

(b) in good faith; and

(c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.

The same Code Section states who cannot be a holder in due course:

A holder does not become a holder in due course of an instrument:

(a) by purchase of it at judicial sale or by taking it under legal process; or

(b) by acquiring it in taking over an estate; or

(c) by purchasing it as part of a bulk transaction not in the regular course of business of the transferor.

2. Plaintiff insists that it took for value, in good faith and without notice. Defendants assert plaintiff gave only partial value, did not act in good faith, and had notice of certain defenses to the payment of the notes. Further, defendants urge that plaintiff acquired the notes as a part of a bulk transaction not in the regular course of business of Hardi-Gardens, Inc.

3. *Value*

T.C.A. § 47–3–303 states:

A holder takes the instrument for value:

(a) to the extent that the agreed consideration has been performed or that he acquires a security interest in or a lien on the instrument otherwise than by legal process,

(b) when he takes the instrument in payment of or as security for an antecedent claim against any person whether or not the claim is due; . . .

Prior to the pledge of notes on March 6, 1970, Hardi-Gardens was indebted to Bank for $170,000. Accordingly, Bank

has given value to the extent of its antecedent claim of $170,000. T.C.A. § 47–3–303(b). At the time of the pledge, Bank advanced Hardi-Gardens an additional $100,000 for a total debt of $270,000 as of the date of pledge. At the time of the pledge, the Bank was committed to lend up to $370,000.00. The indebtedness later increased to as much as $764,000.00 and at the time of foreclosure was $745,000. While it is true that the Bank, as pledgee, is a holder in due course only to the extent that it gives value, the question of value is moot in the present case.

A holder in due course is deemed to give value to the extent that the agreed consideration has been performed or when he takes collateral for an antecedent debt. In the aggregate, the principal amount of defendants' notes is $207,375.00. As of the date of the pledge, plaintiff had given value of $270,000 and was committed to extend an additional $100,000. When all credits are given to the Hardi-Gardens debt, there remains outstanding far more than $207,375. Defendants are in error in claiming that Bank received a $250,000 payment on March 30, 1972. On that date the Bank was required to charge off that amount as uncollectible for accounting purposes, but no such payment was received. Defendants also err in their insistence that the "value" given by Bank must be reduced by $85,000.00 which was the total amount received by Bank when the notes were sold at foreclosure. There is neither statutory nor case law to support such a theory. If this theory were accepted, and if the notes were sold at foreclosure for full face value, then a purchaser at foreclosure could never be a holder in due course, for the foreclosure proceeds would necessarily reduce the debt by the sales price of the notes.

Defendants urge that in determining the value given for each note, the Court should prorate an admitted value of $320,000 to the total "face" value of all notes held as collateral,
$1,396,325.00. This novel theory is not supported by the Uniform Commercial Code nor the cases decided under it. Such a theory would require the lender, at its peril, to assure itself as to the future collectibility of all notes pledged in order to be fully secured. Needless to say, there is no legal or commercial basis for this proposition.

We find that as of the date of the pledge, Bank gave value in excess of the aggregate amount ($207,375) of the defendants' note so as to be a holder in due course of each of the defendants' notes.

### 4. *Good Faith*

The term "good faith" means honesty in fact in the conduct or transaction concerned. T.C.A. § 47–1–201(19). The particulars of the loan are discussed in detail under the caption "Notice", below. Accordingly, at this point, it is sufficient to note (1) that the loan was a commercial financing transaction which was to be repaid in a short period and (2) that Bank had good cause to believe that the notes securing the Hardi-Gardens loan were enforceable instruments executed by successful businessmen. The uncontradicted testimony of the lending officer was that Hardi-Gardens informed him that the notes were fully collectible obligations of responsible makers. There was no deliberate effort to avoid investigation of the notes and the makers. The notes of Myers, Engelbrecht and Garlawn were unconditional and did not refer to a separate agreement. The Bank was furnished with financial statements of the makers and there is no showing that the Bank was not entitled to rely upon Hardi-Gardens representations concerning the notes. It is necessary to avoid the obvious tendency to view this question in the light of hindsight. The Tennessee law is settled that "good faith" means honesty in fact and "a holder need not exercise due care including the observance of reasonable commercial standards in addition to 'honesty in fact' to be in good faith." McConnico

v. Third National Bank in Nashville, 499 S.W.2d 874 (973). The Tennessee Supreme Court explains its holding as follows:

> A holder need not exercise due care including the observance of reasonable commercial standard in addition to "honesty in fact" to be in good faith. The legislative history of § 3–302(1)(b) indicates that the language "including observance of the reasonable commercial standards of any business in which the holder may be engaged" was deleted in the 1956 Recommendations and text. The comments to that section make it clear, "that the doctrine of an objective standard of good faith . . . is not intended to be incorporated in Article 3." Am.Law.Inst.Uniform Commercial Code, 1956 Recommendations, p. 102. This means that unless the conduct amounts to dishonesty and bad faith, in fact, due course holder status is not lost, insofar as this test is involved. In the instant case, there is no showing of such conduct as would evidence dishonesty and consequently such bad faith under the statute as to sacrifice holder in due course status.

In addition, the Court stated that negligence has no reflection on the good faith requirement of a holder's status as a holder in due course absent such outrageous conduct as would reflect on the issue of honesty. *Id.* at 881. See also DeVita Fruit Company, Bankrupt, v. F C A Leasing Corp., 473 F.2d 585 (6th Cir. 1973). The fact that the Bank might have exercised better credit judgment with respect to the collateral is of no occasion. The evidence reveals no basis for concluding that the Bank engaged in conduct which "would evidence dishonesty and consequently such bad faith under the statute as [would] sacrifice holder in due course status." McConnico v. Third National Bank, *supra.*

### 5. *Notice*

In the pretrial orders, defendants assert that plaintiff cannot be a holder in due course because it had notice (1) that the notes were overdue and (2) that defendants had defenses to the payment of the notes.

The first assertion is without any factual basis, for none of the notes pledged on March 6, 1970 became due and payable until April 24, 1970. Nor is there any evidence that the payment of any of the notes had been accelerated.

Despite the defendants' assertions the record is void of any evidence that on March 6, 1970 plaintiff had any notice of any defense to the payment of the notes.

■ The term "Notice" is defined by the Uniform Commercial Code, T.C.A. § 47–1–201(25) as follows:

> A person has "notice" of a fact when
>
> (a) he has actual knowledge of it; or
>
> (b) he has received a notice or notification of it; or (c) from all of the facts and circumstances known to him at the time in question, he has reason to know that it exists.

"Notice" means notice at the time of the taking, the time of the negotiation of the note, i. e., March 6, 1970, Sullivan v. United Dealers Corp., 486 S.W.2d 699, 701 (Ky.Ct. of App.1972).

The Tennessee Supreme Court has defined actual notice in the following statement:

> The holder's rights cannot be defeated without proof of actual notice of the defect in title or bad faith on his part, evidenced by circumstances. Though he may have been negligent in taking the paper, and omitted precautions which a prudent man would have taken, nevertheless, unless he has acted in *mala fide*, his title according to settled doctrine will prevail. McConnico v. Third National Bank, *supra*, 499 S. W.2d at 882.

■ Moreover, the law imposes no affirmative duty upon the transferee of negotiable paper to make an inquiry as to possible defenses:

> To impose upon one who is offered commercial paper the duty of inquir-

ing in each instance whether obligations have been satisfactorily performed by prior holders would so burden such transactions as to create insuperable impediments to the free exchange of negotiable paper, an indispensable part of modern business. Jaeger & Branch, Inc. v. Pappas, 20 Utah 2d 100, 103, 433 P.2d 605, 607 (1967).

In the case of Ganjo, Inc. v. Tri-Urban Realty Co., Inc., 108 N.J.Super. 517, 261 A.2d 722 (1969), the Court correctly stated that a holder has no affirmative duty to inquire:

. . . proof of circumstances calculated merely to arouse suspicion will not defeat recovery on a negotiable instrument taken for value before maturity.

Applying these standards, the evidence reveals no basis for holding that on March 6, 1970 plaintiff had notice of any defense to the notes which were pledged.

■ The facts set forth in paragraph 13 under the topic of "The Hardi-Gardens Collateral," along with the other facts herein set forth, do not justify an inference of notice or bad faith as defined by the U.C.C. The transactions involved in this case were usual banking transactions. The failure of a bank official to discover that some of the collateral notes, not those of the defendants, were non-negotiable does not constitute notice or bad faith. Nor does his failure to inquire as to the status of the contract arrangement between the franchisor and the maker of the notes. Taken as a whole the Court finds that the plaintiff Bank, when it took defendants' notes as collateral, became a holder in due course.

6. *Authority to Pledge Notes*

■ Defendants assert that Hardi-Gardens had not properly authorized Curtis Carlson to pledge their notes. Because this issue is not raised in the respective pretrial orders, defendants are barred from making this assertion.

The fact that one defendant briefed this issue subsequent to entry of the pretrial order certainly does not constitute a unilateral amendment to the order. As the Honorable Robert Taylor has observed, "if defendant's counsel had desired to present issues at the trial which were not contained in the pretrial order, he should have asked for an amendment to the pretrial order." Neuspickle v. City of Knoxville, 48 F.R.D. 441 (E.D.Tenn. 1969). See also 3 J. Moore's Federal Practice, ¶ 16.19 at 1131 (2d ed. 1972).

In any event, the Bank produced a certificate signed by the Secretary of Hardi-Gardens stating that Curtis Carlson was authorized to borrow money and pledge collateral on behalf of Hardi-Gardens. Counsel for Bank testified that he was unable to locate the minutes. After the conclusion of all evidence the Court offered all parties an opportunity to produce the Hardi-Gardens minutes to reveal whether there was corporate authority for the pledge. None of the parties was able to produce the minutes. In the absence of the original documents, or copies thereof, we find that the best evidence is the oral testimony of the former Chairman of the Hardi-Gardens Board that he specifically recalled official Board action approving and authorizing the pledge of the notes.

7. *Bulk Transaction Not in Regular Course of Business*

■ The final impediment raised to Bank's status as a holder in due course lies in defendants' reliance on T.C.A. 47–3–302(3)(c) which states:

(3) A holder does not become a holder in due course of an instrument:

(a) * * *

(b) * * *

(c) by purchasing it as part of a bulk transaction not in regular course of business of the transferor.

The Uniform Commercial Code fails to define the two key phrases of T.C.A. § 47–3–302(3)(c)—"bulk transaction" and "not in regular course of business of the transferor." Nevertheless, the

official comments do lend help in ascertaining the meaning of these terms. From Comment 3 we find that the term "not in the regular course of business" is confined to a transfer incident to the cessation, liquidation, or reorganization of the transferor in such a manner that the transferee is a mere successor in interest to the transferor.

Comment 3. Subsection (3) is intended to state existing case law. It covers a *few situations* in which the purchaser takes the instrument under unusual circumstances which indicate that he is *merely a successor in interest* to the prior holder and can acquire no better rights. (emphasis is supplied.)

Subsection (3)(c) applies to bulk *purchases* lying outside of the ordinary course of business of the seller. It applies, for example, when a new partnership takes over for value all of the assets of an old one after a new member has entered the firm, or to a reorganized or consolidated corporation taking over in bulk the assets of a predecessor: It has particular application to the purchase by one bank of a substantial part of the paper held by another bank which is threatened with insolvency and seeking to liquidate its assets.

Clearly, at the time of the pledge of the Hardi-Gardens notes it was a viable, expanding enterprise. The pledge of notes was not incident to its cessation of business, liquidation or reorganization. There is no basis for saying that Bank was a mere successor interest to the business of Hardi-Gardens. Rather, the notes were transferred to secure a short term loan which the Bank evidently believed would be repaid in the normal course of events.

It was the expressed intention of the authors of the Code that Section 3-302(3) was to embody "existing case law." What was the existing case law regarding bulk transfers of negotiable instruments? Under precode case law a transferee was not entitled to the status of holder in due course unless he had taken the instrument in the usual course of business. The phrase "a transfer in the usual course of business" was said to mean according to the usage and customs of commercial transactions. In the leading case of Roberts v. Hall, 37 Conn. 205, the test was succinctly stated, as follows: "Is negotiable paper ordinarily used in the way and manner in which [the instrument[s] now before us] was used"? The question must be answered in the affirmative in the present case, for the record is replete with evidence to the effect that borrowers who receive notes in the course of their business operations often pledge the notes to secure business borrowings.

There appear to be only two reported cases involving this subsection. The case of Credit Industrial Corp. v. Di-Nanno, 5 U.C.C. Reporting Service, 877 (Mass.App.Div., 1964) is of no help, as the Court states a mere holding without stating the full facts or its legal analysis —we do not know why the Court concluded that there was a bulk transaction not in the transferor's regular course of business. However, this case involved the *sale* of a negotiable trade acceptance.

The second case is Pugatch v. David's Jewelers, 53 Misc.2d 327, 278 N.Y.S.2d 759 (N.Y.City Civil Court, 1967). In this case which involved the *sale* of notes given in payment for franchise rights, the Court said that "[t]he transfer of a large number of similar items at the same time does not, if [sic] itself, put a purchaser on notice of any defects." The Court found the purchaser of the notes to be a holder in due course, stating:

In today's business world, merchants in every field discount their notes in quantity to give themselves liquidity. This is the regular course of business, and those who take such notes and make ready cash available are not precluded from the status of holders in due course.

In *Pugatch*, the Court analogized to the traditional Bulk Transfer Act which ap-

plies to transfers of merchandise, stating:

> The statutory test is whether the sale was made in the usual way in which a merchant owing debts conducts his business, or whether he takes an unusual method of disposing of his property in order to get the money for his own use, and leaving his creditors unpaid.

The official Comments to Section 3–302(3) do not refer to the transfer of a negotiable instrument for the purpose of securing a debt. There is a notable dissimilarity between the pledge of notes and the examples cited in the Comments. The pledge of notes was incident to the infusion of new funds into a continuing enterprise, not to its liquidation or reorganization. All examples cited in the Comments deal with a permanent transfer of notes whereas a pledge necessarily contemplates that all rights in the notes will revert to the borrower upon payment of the debt.

Every consideration of the character of the pledge of notes by Hardi-Gardens compels the conclusion that the transfer was in the ordinary course of business of the transferor.

8. *Time for Determination of Bank's Status*

The Bank asserts (1) that its status as a holder in due course is determined as of the date of the pledge, March 6, 1970, and (2) that if Bank was a holder in due course on the date of pledge, it retained that status in purchasing the notes at foreclosure, in December, 1972. Certain defendants appear to assert that Bank's status as a holder in due course is determined when it purchased the notes on the date of foreclosure, without regard to Bank's status as a pledgee.

■ This issue is controlled by the so-called shelter provision set forth in Section 3–201(1) of the Code, T.C.A. § 47–3–201(1):

> 47–3–201. Transfer—Right to endorsement—(1) Transfer of an instrument vests in the transferee such rights as the transferor has therein, except that a transferee who has himself been a party to any fraud or illegality affecting the instrument or who as a prior holder had notice of a defense or claim against it cannot improve his position by taking from a later holder in due course.

The foregoing Code Section states in effect that the transferee's status with respect to the notes is the same as the status of the transferor with certain exceptions which do not apply in this case. This is the holding of Finance Company of America v. Wilson, 115 Ga.App. 280, 154 S.E.2d 459 (1967) in which the Court said:

> One with the rights of a holder in due course, and who has not otherwise lost such rights, *does not diminish his status* by purchasing at a judicial sale although he may not by virtue of such purchase alone become a due course holder. (emphasis supplied.)

This decision was cited with approval in 14 Practical Lawyer 79 (April 1968) on the basis that if a party is a holder in due course by virtue of his security interest, "he should continue in that status as absolute owner. . . ." Similarly, see Northside Building & Investment Co. v. Finance Company of America, 119 Ga.App. 131, 135, 166 S.E.2d 608, 611 (1964) in which it was held that "one neither improves nor lessens his position or status" by purchasing at a foreclosure sale of notes.

## CONCLUSIONS

The Court is not unmindful that in the present case each of the defendants will sustain a substantial economic loss arising out of a transaction in which they realized little, if any, economic gain. Nevertheless, the Uniform Commercial Code has adopted and codified certain considerations of commercial transactions which require that the courts enforce a negotiable instrument which comes into the hands of a holder in due course. A maker who executes a negotiable instrument in a commercial

transaction must be prepared to sustain the consequences when that instrument is transferred to a holder in due course. In the present case, we are compelled to conclude that the notes were negotiable instruments and that the Bank was a holder in due course.

An order will be entered to implement this memorandum.