Gary PRENGER and Carol
Prenger, Appellees,

v.

Gene BAKER, Appellant,

v.

Donald R. BAKER, Intervenor–Appellant.

MISSOURI RATITE CENTER,
INC., Appellee,

v.

Gene BAKER, Appellant,

v.

Donald R. BAKER, Intervenor–Appellant.

No. 94–813.

Supreme Court of Iowa.

Dec. 20, 1995.

Rehearing Denied Feb. 14, 1996.

B. Michael Dunn, Mason City, and James M. Stanton of Stanton & Sorensen, Clear Lake, for appellants.

Joel J. Yunek of Laird, Heiny, McManigal, Winga, Duffy & Stambaugh, P.L.C., Mason City, for appellees Prengers.

Scott D. Brown of Brown, Kinsey & Funkhouser, Mason City, for appellee Missouri Ratite.

Considered by McGIVERIN, C.J., and HARRIS, CARTER, LAVORATO, and SNELL, JJ.

SNELL, Justice.

Appellants, Gene and Donald Baker, appeal the trial court's decree in a replevin action establishing ownership of one male ostrich in the appellees Gary and Carol Prenger, and establishing ownership of another male ostrich in appellee Missouri Ratite Center, Inc. We affirm.

## I. Factual and Procedural Background

In approximately 1988, Ron Rasmus entered into the business of buying, selling, and raising exotic animals including ostriches. He conducted these activities at his Hancock County, Iowa farm. In 1988, defendant, Gene Baker began purchasing ostriches and other flightless birds (known as ratites) for investment purposes. For some time previously, Baker, a livestock farmer, had been boarding his extra swine at Rasmus' farm. According to their agreement, Baker could place and remove swine at will, and Rasmus was paid out of the profits when the swine were sold. Because this agreement had proven beneficial, Baker chose to enter into an agreement for a similar arrangement to board ostriches. Under the boarding contract, Rasmus was to receive a portion of the profits from any sales from the breeding ostriches as well as $25 per month for the care of the juvenile ostriches. Between the years 1990 and 1993, Baker purchased what eventually became two adult breeding pairs of ostriches.

On January 12, 1992, Gene Baker sold one of the breeding pairs to his father, Don Baker, for $25,000. Don Baker also chose to leave the birds in the care of Rasmus under the agreement.

On June 18, 1993, Mike Pickard, acting on behalf of Missouri Ratite Center, Inc.

(MRC), purchased for MRC the two adult ostrich breeding pair from Rasmus for $75,000. Pickard then proceeded to sell one pair to Gary Prenger for $37,500. Prenger also traded Rasmus two adult emus in return for two juvenile ostrich pairs. Both Prenger and MRC left the ostriches with Rasmus; Prenger did so pending the preparation of his own facilities and both did so to avoid disturbing the birds during the egg laying season.

On September 10, 1993, Gene Baker removed several animals from the Rasmus farm and transported them to his farm. These included the following: the breeding pair purchased by Prengers, the male purchased by MRC (by Pickard), and several juvenile ostriches. The female of the pair claimed by Pickard (MRC) was not found at this time. One of the juvenile birds was later identified by microchip as belonging to Prenger and was immediately delivered to him. The female of the Prenger pair later died in January, 1994 of aspergillosis while at Baker's farm. Baker never informed plaintiffs of the bird's death prior to trial; rather, he replaced the bird with another in order to test Rasmus' ability to identify the bird. Other than the bird positively identified by microchip, the plaintiffs were unable to positively identify any of the juvenile birds present at Baker's farm.

On December 22, 1993, Gary and Carol Prenger filed an action in replevin against Gene Baker alleging he wrongfully retained possession of the birds and requesting return of the birds as well as damages for the value of any of the birds destroyed or disposed of by Baker. MRC also filed an action in replevin against Baker seeking possession of their pair or the sum of $37,500 in the alternative.

Gene Baker answered, alleging the birds at issue were owned by Donald Baker and himself and they were entitled to possession. Donald Baker next filed a petition of intervention alleging he had purchased a pair of the ostriches from Gene Baker for $25,000 and was therefore a good faith purchaser and therefore entitled to possession of the birds.

On April 28, 1994, trial began before the district court for Cerro Gordo County. The court then issued its Findings of Fact, Conclusions of Law, and Judgment. It decreed the Plaintiffs, Gary and Carol Prenger, were absolute owners of one male ostrich denominated the "Prenger Male" and entitled to immediate possession thereof, and MRC was absolute owner of one male ostrich denominated the "Pickard Male" and entitled to immediate possession thereof. The findings were later expanded to set the value of the "Pickard Male" at $12,500 and the "Prenger Male" at $12,500 at the date of the taking.

Defendant, Gene Baker, and intervenor, Donald Baker, appeal from the trial court's determination of ownership of the "Prenger Male" in Gary and Carol Prenger and ownership of the "Pickard Male" in MRC. Plaintiff MRC cross-appeals on the trial court's failure to find the "Pickard Female" was wrongfully converted by the defendant, seeking possession of the bird and or damages. Plaintiffs Prengers cross-appeal the trial court's failure to find the "Prenger Female" was wrongfully converted by the defendant, seeking possession and damages for its death. Prengers also appeal the trial court's findings with regard to the cause of death of the "Prenger Female" and the trial court's findings the three juvenile birds were never owned by Gene or Donald Baker. We affirm on all issues.

## II. Scope of Review

The standard of review in this replevin action is for correction of errors of law. Iowa R.App.P. 4. We will not disturb the trial court's findings of fact as long as they are supported by substantial evidence in the record. Iowa R.App.P. 14(f)(1).

## III. Entrustment

This case is controlled by Iowa Code chapter 554, the Iowa adoption of the Uniform Commercial Code. *See* Iowa Code § 554.2102 (1993). Iowa Code section 554.2403(2) provides as follows:

Any entrusting of possession of goods to a merchant who deals in goods of that kind gives the merchant the power to transfer all rights of the entruster to a buyer in the ordinary course of business.

The code further defines "entrusting" as follows:

> any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law.

*Id.* § 554.2403(3).

■■■■ The term "merchant" is defined, for U.C.C. purposes, as follows:

> a person who deals in goods of the kind or otherwise by the person's occupation holds that person out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by the person's employment of an agent or broker or other intermediary who by the intermediary's occupation holds the intermediary out as having such knowledge or skill.

*Id.* § 554.2104(1). The determination of whether a party to a transaction is a merchant is a question of fact. *Bauer v. Curran,* 360 N.W.2d 88, 90 (Iowa 1984); *see also Greater Southern Dist. Co. v. Usry,* 124 Ga. App. 525, 184 S.E.2d 486, 487 (1971); *Canterra Petroleum, Inc. v. Western Drilling & Mining Supply,* 418 N.W.2d 267, 270 (N.D. 1987). Additionally, the inquiry is of necessity highly dependent on the factual setting of the transaction in question. Consequently, whether a person is a merchant is to be determined according to the circumstances of each case. 1 Ronald A. Anderson, Uniform Commercial Code § 2–104:25 (3d ed. 1981); *see also Ferragamo v. Massachusetts Bay Transp. Auth.,* 395 Mass. 581, 481 N.E.2d 477, 480 (1985). The requirement that the party "deals in goods of that kind" is generally interpreted to mean one who is engaged in regularly selling goods of the kind at issue. *Canterra,* 418 N.W.2d at 271; *see also Toyomenka, Inc. v. Mount Hope Finishing Co.,* 432 F.2d 722, 727 (4th Cir.1970); 3 Anderson § 2–403:31.

The phrase "buyer in the ordinary course of business" is also defined in the code:

> a person who in good faith and without knowledge that the sale to that person is in violation of the ownership rights or security interest of a third party in the goods buys in the ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker.... "Buying" may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a pre-existing contract for sale but does not include a transfer in bulk or as security for or in total or partial satisfaction of a money debt.

*Id.* § 554.1201(9).

■■■ The code defines good faith as "honesty in fact in the conduct or transaction concerned." *Id.* § 554.1201(19). This definition has been universally interpreted to require a wholly subjective test examining what the party actually believed at the time of the transaction. *First Nat'l Bank v. Creston Livestock,* 447 N.W.2d 132, 134 (Iowa 1989); *Farmers Coop. Elevator, Inc. v. State Bank,* 236 N.W.2d 674, 678 (Iowa 1975); *see also Bowling Green, Inc. v. State Street Bank & Trust Co.,* 425 F.2d 81, 85 (1st Cir.1970); *Third Nat'l Bank v. Hardi–Gardens Supply,* 380 F.Supp. 930, 940–41 (M.D.Tenn.1974). The purpose of the good faith purchaser doctrine is to "promote commerce by reducing transaction costs;" it allows the consumer to safely purchase goods without conducting an extensive investigation of the conduct and rights of every previous possessor through the product's chain of distribution. *Johnson & Johnson Products, Inc. v. Dal Int'l Trading Co.,* 798 F.2d 100, 104 (3d Cir.1986); *see also* 1 Anderson § 2–103:23; E. Alan Farnsworth, *Good Faith Performance & Commercial Reasonableness Under the Uniform Commercial Code,* 30 U.Chi.L.Rev. 666, 671 (1963) ("Authority happens to favor the subjective test [of good faith purchase] in order to promote the circulation of goods and commercial paper."); Grant Gilmore, *The Commercial Doctrine of Good Faith Purchase,* 63 Yale L.J. 1057, 1057 (1954) (The good faith purchaser "is protected ... to the end that commercial transactions may be engaged in without elaborate investigation of property rights and in

reliance in the possession of property by one who offers it for sale . . . .").

*Williston on Sales* summarizes the predominant requirements to establish entrustment:

> First, there must be an actual entrustment of the goods by the delivery of possession of those goods to a merchant. Second, the party who receives possession of those goods must be a merchant who deals in goods of that kind. Third, that merchant who deals in goods of that kind must make a sale of those goods. Fourth, the sale which the entrusted merchant makes must be to a buyer in the ordinary course of business.

3 Samuel Williston, *Williston on Sales* § 23–14 (4th ed. 1974).

■ Upon examination of the records and findings of fact made by the district court, it is clear the court's finding the plaintiffs Gary and Carol Prenger and MRC have established the elements of entrustment is supported by substantial evidence. Initially, it is undisputed that the birds in issue here were delivered to Ron Rasmus by Gene Baker to be boarded at the Rasmus farm. Although the parties dispute Rasmus' status as a "merchant" under the U.C.C., the trial court's finding Rasmus is a merchant is supported by substantial evidence and sound legal principles. Whether Rasmus, a farmer, is a merchant within the meaning of the U.C.C. is clearly a question of fact dependent upon the attending circumstances. *Bauer v. Curran*, 360 N.W.2d at 90. In Iowa this court has examined whether a farmer deals routinely in the type of goods sold, as well as whether he holds himself out as having particular skills or knowledge of the goods. *Id.* at 90–91; *see also Dotts v. Bennett*, 382 N.W.2d 85, 89 (Iowa 1986) (holding a jury may find a farmer is a merchant when he grows only one crop and annually sells a substantial part of the crop); *Sand Seed Service, Inc. v. Poeckes*, 249 N.W.2d 663, 666 (Iowa 1977) (holding farmer who made only an annual sale of crop not a merchant but explaining that under the proper circumstances a farmer could be a merchant); *Vince v. Broome*, 443 So.2d 23, 25 (Miss.1983) (holding a farmer may be classified as a merchant when the size and nature of his activities establish he is not a mere casual or inexperienced seller). In this case, the evidence presented clearly establishes Rasmus bought and sold exotic animals (including ostriches) on his own and on behalf of Gene Baker. The evidence presented established Rasmus had been in the business of raising and selling exotic animals for at least six years. Thus, the trial court's finding Rasmus was a merchant under the U.C.C. is clearly supported by substantial evidence.

■ The third element, that the entrusted merchant must make a sale of the goods, is also clearly established by the evidence. There is no dispute whatsoever that Ron Rasmus sold two of the ostrich pairs to MRC for the sum of $75,000. Thus, the question then becomes whether MRC was a "buyer in the ordinary course of business," thus resulting in MRC acquiring the birds free of any outstanding title of Gene Baker, the true owner under Iowa Code section 554.2403.[1] The determination whether a party is a buyer in the ordinary course of business is a question of fact. *Herman v. First Farmers State Bank of Minier*, 72 Ill.App.3d 475, 29 Ill.Dec. 787, 788, 392 N.E.2d 344, 345 (1979). In order to be a buyer in the ordinary course of business, one must act in good faith with no knowledge or notice of any adverse title or ownership claims. Iowa Code § 554.1201(9). Iowa Code section 554.1201(25) provides "[a] person 'knows' or has 'knowledge' of a fact when he has actual knowledge of it." This knowledge is measured at the time of the transaction at issue,

---

1. Bakers make the erroneous argument that Prengers, having purchased their pair from MRC (who earlier purchased from Rasmus), are not entitled to the section 554.2403 protections as buyers in the ordinary course because they (Prengers) have no direct nexus with Rasmus. This argument fails to see the effect of section 554.2403, however, because as long as MRC satisfies the requirements of 554.2403, MRC takes the birds with title free from any claims of Baker. This being the case, MRC is free to transfer its good title to any other buyers much the same as if it had been the original true owner. Therefore, Baker's additional contention, that the Prengers may not be buyers in the ordinary course due to the sale being in partial satisfaction of an antecedent debt need not be addressed.

the sale from Rasmus to MRC; it matters not whether the plaintiffs learned of Baker's claims at a later time. *G.E. Credit Corp. v. R.A. Heintz Constr. Co.,* 302 F.Supp. 958, 962 (D.Or.1969). In this case, neither Prengers nor MRC had any knowledge of Gene Baker's interest in the birds at the time of their purchases. Therefore, they certainly qualify as buyers in the ordinary course of business and take free of any claims of Bakers. Because the trial court's findings that the elements of entrustment were established by the plaintiffs are supported by substantial evidence, the court's order establishing absolute ownership of the "Prenger Male" in Gary and Carol Prenger, and the "Pickard Male" in MRC is affirmed.

### IV. Replevin

 Both MRC and Prengers cross-appeal the trial court's failure to establish absolute ownership of the respective female birds in them. Replevin is a statutory proceeding governed in part by Iowa Code section 643.1. Section 643.1 provides a plaintiff must state "a particular description of the property claimed," as well as "facts constituting the plaintiff's right to present possession thereof." The question we must face then, is the meaning of the phrase "a particular description of the property sought." In this case, there is no question the plaintiffs are entitled to possession of the birds as purchasers in the ordinary course of business; the question is one of identification.

This precise question was presented in an earlier, yet instructive, Iowa case entitled *Lyons v. Shearman,* 245 Iowa 378, 380–81, 62 N.W.2d 196, 196–97 (1954). In *Lyons,* a farmer sought replevin of his cattle from an adjacent farmer onto whose property his cattle had wandered. *Id.* at 380, 62 N.W.2d at 196–97. Much the same as in our case, the cattle had been branded, but the parties were still unable to identify which cattle were the ones at issue. *Id.* We explained

> While it is true as asserted by plaintiffs that right to present possession is the gist of the action, unless the chattel, subject matter of the action, is so described that it may be identified by reasonable means, the

right to possession means nothing. He must show *what* he is entitled to possess.

Plaintiffs, under this record, have failed to establish the necessary allegations of their petition and ... the judgment must be affirmed, without prejudice, however, to plaintiffs' right to pursue any other remedy that may be available to them.

*Id.* at 381–82, 62 N.W.2d at 197–98 (emphasis added).

In this case, the record is replete with contradictory testimony regarding the identity of the juveniles and the two female ostriches. Although some evidence has been presented alleging the birds have been microchipped for identification purposes, it appears even this is contradictory. The trial court found the plaintiffs failed to meet their burden of proof necessary to obtain judgment with respect to the two female ostriches and the juveniles. This question being one of fact, the trial court is clearly in a superior position to make such a decision. Because the trial court's findings in this respect were supported by substantial evidence, we will not disturb them.

We affirm on the appeal and cross-appeals.

**AFFIRMED.**