## NICHOLAS ABRAHAM vs. CITY OF WOBURN.

Middlesex.    April 22, 1980. — August 20, 1980.

Present: GREANEY, PERRETTA, & KASS, JJ.

*Riot. Municipal Corporations,* Statutory liability for damage by riot.

For purposes of imposing municipal liability under G. L. c. 269, § 8, a
claim that property damage resulted from a riotous or tumultuous
assembly requires a showing that the activity was open and had been
witnessed and that there was a concerted intent by members of the as-
sembly to resist those who might oppose them; a riot cannot be in-
ferred from the nature of the damage alone. [417-424]

TORT.    Writ in the Superior Court dated December 8,
1970.

The case was tried before *Alberti,* J.

*Carol J. Muller,* City Solicitor, for the defendant.

*Neal C. Tully (Edward I. Masterman* with him) for the
plaintiff.

KASS, J.    Some time late September 3, 1970, or early the
next morning, the plaintiff Abraham's bowling alley in
Woburn was atrociously vandalized.    Acting under G. L.
c. 269, § 8, as amended by St. 1965, c. 647, § 3, which im-
poses tort liability upon municipalities for damage to prop-
erty by persons "who are riotously or tumultuously assem-
bled," Abraham brought an action against Woburn, upon
which a jury returned a verdict of $147,750.[1]

---

[1] The full text of G. L. c. 269, § 8, is: "If property of the value of fifty
dollars or more is destroyed or if property is injured to that amount by five
or more persons who are riotously or tumultuously assembled, the town
within which the property was situated shall, if the owner of such prop-
erty uses all reasonable diligence to prevent its destruction or injury, and
to procure the conviction of the offenders, be liable to indemnify the
owner thereof in tort to the amount of three fourths of the value of the

At the close of the plaintiff's evidence, and again after all the evidence was received, Woburn moved unsuccessfully for a directed verdict. See Mass.R.Civ.P. 50(a), 365 Mass. 814 (1974).[2]  After the jury returned its verdict, the city moved for judgment notwithstanding the verdict, Mass.R. Civ.P. 50(b), 365 Mass. 814 (1974); that motion was also denied. Whether the case should have gone to the jury is the principal question on appeal. In formulating our answer we consider whether the evidence, taken in the light most favorable to the plaintiff, if believed, would warrant a finding for the plaintiff on each essential element required by the statute under which liability is sought to be imposed. See, e.g., *Alholm* v. *Wareham*, 371 Mass. 621, 623-625 (1976); Smith & Zobel, Rules Practice § 50.6, at 202 (1977). See by analogy the standards for a directed verdict in a criminal case. *Commonwealth* v. *Campbell*, 378 Mass. 680, 685-686 (1979). This we do without weighing the credibility of witnesses or substituting our judgment of facts for that of the jury. *O'Shaughnessy* v. *Besse*, 7 Mass. App. Ct. 727, 728 (1979). *Simblest* v. *Maynard*, 427 F.2d 1, 4 (2d Cir. 1970).

On the plaintiff's evidence, the jury might have found that when the damage occurred the bowling alley, which was located in the Four Corners area of Woburn, was closed for the summer. The building was secured, the bowling alley's manager, who lived nearby, checked the building regularly, and the plaintiff Abraham inspected it inside and out every Saturday.

During the summer of 1970 there was much unrest among the young people of the city, which manifested itself

property destroyed or of the amount of such injury thereto, and may recover the same against any or all of the persons who destroyed or injured such property." The judge applied the three-fourths of the damage ratio prescribed by the statute and reduced the damages to $110,802.50. Judgment entered accordingly.

[2] The only ground stated in the motion for a directed verdict was that the element of a riotous or tumultuous assembly could not be inferred from the evidence.

in acts of vandalism. Gangs of teenagers congregated regularly at the Four Corners, approximately 100 to 300 yards from the alley. On six to eight occasions during June, July and August, the bowling alley sustained minor damage from vandalism, and in each instance Abraham received notice from his manager or the Woburn police, who regularly patrolled the area.

Abraham inspected the property on August 29, 1970, the Saturday preceding the weekend on which the damage occurred, and found nothing untoward at the bowling alley, except for some broken windows. When he was summoned to his property by telephone on Saturday morning of the next week, what Abraham saw looked to him as if "a bomb hit the place." All of the exterior glass was broken, the front door was smashed; two large roof signs were destroyed; ceiling tiles were torn down; interior glass was almost entirely broken; the rugs in the lobby and pool room were soaked with water, paint and syrup; vending machines were tipped over; metal T-bars and grid work which supported the ceiling were torn down and twisted; wires and metal ducts were hanging loose from the ceiling; bowling equipment and the electric control equipment for keeping score was heavily damaged; bowling shoes and other items of equipment were strewn about. This list does not exhaust the catalog of destruction.

How and when the devastation occurred went unobserved. Who the perpetrators of the outrages were is unknown. No contention is raised by the city that the plaintiff failed in his statutory obligation to use "all reasonable diligence to prevent" the destruction of his property and to procure the conviction of the offenders.

A newspaper report of the incident, received in evidence without objection, quoted Abraham as saying, "A total riot occurred inside the building." At trial, Abraham was permitted to testify, without objection, that the damage had been caused by a riot. The city editor of the Woburn Daily Times, a newspaper, was permitted to testify, without objection, on the basis of observing the damage at the bowl-

ing alley, that the destruction was the work of "riotous gangs that hang around and hung around that section and other sections of the City." Edward Gill, who had been mayor of Woburn at the time the damage in the bowling alley was discovered, testified, without objection, that the damage was attributable to "a riotous act or a cyclone."

We agree with the plaintiff that although the text of the newspaper article and the quoted testimony of the city editor and the mayor were excludable upon objection, in the absence of objection this otherwise incompetent evidence took on probative force. *Eastern Paper & Box Co.* v. *Herz Mfg. Corp.,* 323 Mass. 138, 143 (1948). *Freyermuth* v. *Lutfy,* 376 Mass. 612, 616-617 (1978). Leach & Liacos, Massachusetts Evidence 72 (4th ed. 1967). Testimony labeling the event a "riot" does not, however, relieve the judge of his obligation to ascertain whether the evidence is sufficient in law to support a verdict in the plaintiff's favor.

All who gave testimony conceded they saw no rioters, witnessed no assembly and heard no activity at the bowling alley. Their characterization of the damage to the bowling alley as the consequence of riotous conduct was, therefore, based entirely on inferences they drew from the nature of the destruction and their general awareness of gangs hanging around in the area. The question on which we must focus is whether, for purposes of G. L. c. 269, § 8, there can be a riotous or tumultuous assembly that is neither seen nor heard; i.e., can there be a quiet riot?

Only one decision, *Yalenezian* v. *Boston,* 238 Mass. 538 (1921), has construed the applicable riot statute.[3] That opin-

---

[3] The statute construed in *Yalenezian* was codified as R. L. c. 211, § 8 (1902), and differs from G. L. c. 269, § 8, only in that the current statute speaks of an assembly of five or more persons, while the previous version spoke of twelve or more, and imposes liability upon the "town" within which the damaged property is situated, while the previous version referred to "city or town." The reduction in numbers from twelve to five was expressly worked by St. 1965, c. 647, § 3. We ascribe no significance to the deletion of the word "city" in view of G. L. c. 4, § 7, definition of the word "town."

ion defines the statutory phrase "riotously or tumultuously assembled" as an unlawful assembly "which has proceeded to execute an unlawful purpose in a way that has resulted in the destruction of property or of injury thereto, and in a manner to give firm and courageous persons in the neighborhood of such assembly reasonable grounds to apprehend a breach of the peace in consequence of it." 238 Mass. at 542-543. If firm and courageous persons are to be in the neighborhood of an assembly about which they develop apprehensions, it is a fair inference that they must see or hear the disturbance. That element was present in *Yalenezian*: witnesses testified that there was a large crowd of people in the street "shouting, shooting dice for money, singing, dancing and fighting" and that windows of a store "were crashed and broken, and fifteen or twenty men entered the store and came out with clothing on their arms." *Id.* at 542. The *Yalenezian* case also decided that a claimant under the statute did not have to establish that the violence was such as to alarm at least one person of reasonable firmness and courage. *Id.* at 540-541, 543. In this the decision was faithful to *Commonwealth* v. *Runnels*, 10 Mass. 518, 519 (1813), which, dealing with the criminal riot statute (now found in G. L. c. 269, § 1), said "that there may be a riot without terrifying anyone." See also Legislation, Communal Liability for Mob Violence, 49 Harv.L.Rev. 1362, 1364 (1936) (suggesting it is "doubtful whether the activities and character of the mob must be such as would put in fear a man of reasonable courage"). It is, thus, sufficient if our hypothetical stouthearted person apprehends a breach of the peace; he need not sense personal danger.

We are of the opinion that the history of G. L. c. 269, § 8, and similar statutes reinforces the view that its target is damage resulting from open and observed conduct, and not unexplained malicious mischief or breaking and entering. See e.g., *Duryea* v. *New York*, 10 Daly 300, 305 (N.Y.C.P. 1882), aff'd, 100 N.Y. 625 (1885), in which the wrecking of a building by a group of boys was held not to be the consequence of riotous conduct, but rather malicious mischief,

because they ran away at the approach of a single police-
man. Statutes imposing civil liability on municipalities for
damage due to riots have descended from the Statute of
Winchester of 1285, 13 Edw. 1, st. 2, c. 2, 3 reenacted 28
Edw. 3, c. 11 (1354) and 27 Eliz. 1, c. 13, § 2 (1585); and
from the Riot Act of 1714, 1 Geo. 1, st. 2, c. 5, §§ 1-7. See
Note, Riot Insurance, 77 Yale L.J. 541, 552-553 (1968).
Anciently, these statutes imposed liability on local citizens
for crimes (one imagines particularly against royal authori-
ty) committed in their neighborhoods.[4]  These acts were re-
pealed in 1827, and there occurred an immediate reenact-
ment providing remedies for riot damage only. 7 & 8 Geo.
4, c. 31 (1827) and 2 & 3 Will. 4, c. 72 (1832). The present
English statute is the Riot (Damages) Act of 1886, 49 & 50
Vict., c. 38. See also 3 Blackstone, Commentaries 160-161
(Wendell ed. 1850); *Darlington* v. *Mayor of New York*, 31
N.Y. 164, 187-188 (1865); Legislation, Liability of the
Municipality for Mob Violence, 6 Fordham L.Rev. 270, 272
n.15 (1937). What is now c. 269, § 8, was introduced into
the Massachusetts statutory scheme in 1839, "partly, no
doubt, . . . as a result of the anti-Catholic riots in Charles-
town in 1834, when the Ursuline Convent was burned, and
the Broad Street riot of 1837, when several buildings were
burned." Discussion of the Recent Opinion as to Municipal
Liability for Looting by Rioters, 6 Mass. L.Q. (No. 5) 205, 211
(1921). Taken as a broad category, American riot statutes
were enacted in response to such activities as lynchings,
labor confrontations, civil disturbances, and demonstra-
tions involving religious feelings. See *Koska* v. *Kansas City*,
123 Kan. 362, 364 (1927); Legislation, Communal Liability

---

[4] The collision of royal authority with local contumacy sounds through
the opening words of the Statute of Winchester: "Forasmuch as from
Day to Day, Robberies, Murthers, Burnings and Theft, be more often
used than they have been heretofore, and Felons cannot be attainted by
the Oath of Jurors, which had rather suffer Strangers to be robbed, and so
pass without Pain, than indite the Offenders. . . ." 13 Edw. I, st. 2, c. 2
(1285). See Note, Municipal Liability for Riot Damage, 16 Hastings L.J.
459, 460 (1965).

for Mob Violence, 49 Harv. L. Rev. 1362, 1364 (1936);
Annot., Municipal Liability for Property Damage Under
Mob Violence Statutes, 26 A.L.R.3d 1198, 1206 n.4 (1969).
It was their purpose "to make good, at the public expense"
not the consequence of all crimes but losses from "acts of
lawless violence of a particular kind which it is the general
duty of the government to prevent." *Yalenezian* v. *Boston,*
238 Mass. at 541, citing *Underhill* v. *Manchester,* 45 N.H.
214, 221 (1864).

The particularized objective of a statute similar to G. L.
c. 269, § 8, was differentiated by the Supreme Court of New
Jersey from "a common criminal event committed for the
private gain or gratification of the offenders merely because
they number three or more." *A. & B. Auto Stores of Jones
Street, Inc.* v. *Newark,* 59 N.J. 5, 17 (1971). Riot connotes
something more than a spree involving joint violation of a
criminal statute. "Usually there is present an element of
reaction to or protest because of some political, social,
racial, ethnic, or economic issue which affects the rioters in
a common way. Although we are reluctant to say the com-
mon cause must always be of that character, we think it cor-
rect to say that its absence would lead a court to consider
carefully whether the participants could be said to con-
stitute a mob or the event a riot in the lay sense of those
words." *Id.* at 17-18.

Commenting in 1968 on proposed amendments to the
Massachusetts Riot Act (G. L. c. 269, § 1), the Massachusetts
Judicial Council compiled a list of seventy-two "noted riots"
which had occurred in the Commonwealth since 1810. 44th
Report of the Judicial Council, Pub. Doc. No. 144, at 61,
70-76 (1968). All but three involved social, political, or
ethnic issues;[5] of those three, two disturbances, in 1818 and
1825, were by theater patrons and swirled around ap-
pearances of a British actor, Edmund Keane, and the third,

---

[5] For example, competition for work, religion, housing, abolition of
slavery, the Know Nothing movement, the draft, labor disputes, commu-
nism, ethnic rivalries, welfare protests, and racial discrimination.

in 1854, involving "Harvard Boys and Fireman," was assigned the cause, "Youth and April." *Id.* Even these three frivolous disorders presumably shared the common characteristic of a riot: the assembly was out of control and not responsive to public authority.

This ingredient of resistance to control was emphasized in *Providence Wash. Ins. Co.* v. *Lynn*, 492 F.2d 979 (1st Cir. 1974), in which the court wrote at 983, "The cases wherein destructive activity has been found to be riotous have been ones where the illegal act was accompanied by the use of force, or the threat of use of force, against anyone who might interfere with the criminal enterprise." In that case a fire was set by persons who thought they were acting secretly or unobserved (they were mistaken and convicted of arson). The court said that stealthy destructive activity accomplished without force or the threat of force to those who might interfere does not constitute a riot. *Id.* at 983. See also *Hartford Fire Ins. Co.* v. *War Eagle Coal Co.*, 295 F. 663, 665 (4th Cir. 1924) (secret burning of a building); *Salem Mfg. Co.* v. *First Am. Fire Ins. Co.*, 111 F.2d 797 (9th Cir. 1940) (secret burning of a building); *Walter* v. *Northern Ins. Co.*, 370 Ill. 283, 286-292 (1938) (smearing of walls, ceiling, windows and floors with creosote secretly at night). Two common threads run through the cases cited in this paragraph. The first is that a riot or civil commotion requires a concerted intent by the perpetrators to resist or overcome all who might oppose them, that is, open as opposed to secretive or clandestine conduct. The second common theme is that interpretation of the riot and civil commotion exemption or the riot and civil commotion coverage in insurance policies was involved. This latter element in the cases underscores that an important purpose of statutes such as G. L. c. 269, § 8, is to provide redress of injuries for which other forms of compensation may be unavailable. Riot and civil commotion exclusions from insurance policies became more common as riots became more common. See Note, Municipal Liability for Riot Damages, 81 Harv.L.Rev. 653, 655 (1968); Note, Riot Insurance, 77 Yale L.J. at 543.

Indeed, something about the limited purpose of G. L. c. 269, § 8, may be deduced from the distinct categorization in the General Laws of unlawful, riotous or tumultuous assembly and refusal to obey an order to assist in suppressing a riot or an order to depart from a riot, which appear in c. 269, §§ 1 and 2, and of crimes against property, which appear in c. 266. See particularly G. L. c. 266, § 127, regarding wilful and malicious destruction or injury to real or personal property. Extending the reach of G. L. c. 269, § 8, to an array of crimes against property in the nature of vandalism would expose municipal coffers to a drain we do not think the Legislature intended.

We hold that a riotous and tumultuous assembly, in the statutory sense, requires that the activity be open and have been witnessed and that there be a showing of concerted intent by members of the assembly to resist those who might oppose them. As to this there was no evidence. A riot cannot be inferred from the nature of the damage alone. Absence of these elements in the present case required that the defendant's motions be allowed. The orders denying those motions are reversed, the verdict set aside, and judgment is to be entered for the defendant.

*So ordered.*