## NICHOLAS ABRAHAM *vs.* CITY OF WOBURN.

Middlesex.  February 5, 1981. — June 5, 1981.

Present: HENNESSEY, C.J., BRAUCHER, WILKINS, LIACOS, & ABRAMS, JJ.

*Riot.  Municipal Corporations,* Statutory liability for damage by riot.

In an action pursuant to G. L. c. 269, § 8, which imposes liability on a municipality for damage caused by five or more persons "riotously or tumultuously assembled," there was sufficient evidence, including evidence of the near-total destruction of the plaintiff's bowling alley and the history of roving gangs in the city, to warrant a finding that the damage was the result of a riotous or tumultuous assembly of five or more persons even though there was no direct testimony as to the existence of such a gathering.  [727-730] HENNESSEY, C.J., dissenting.

In an action pursuant to G. L. c. 269, § 8, which imposes liability on a municipality for damage caused by five or more persons "riotously or tumultuously assembled," there was no merit to the city's contention that the plaintiff should not be permitted to recover for extensive damage to his bowling alley because such recovery would be burdensome to taxpayers.  [731-732]

In an action pursuant to G. L. c. 269, § 8, which imposes liability on a municipality for damage caused by five or more persons "riotously or tumultuously assembled," the judge did not err in refusing to instruct the jury that "those assembled must have intended to help one another by force if necessary against any person who should oppose them in the execution of their common purpose" and that "those assembled must have not only used force or violence in demolishing and destroying the plaintiff's property but must have displayed such force or violence in such a manner as to have alarmed at least one person of reasonable firmness and courage."  [732]

TORT.  Writ in the Superior Court dated December 8, 1970.

The case was tried before *Alberti,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Neal C. Tully (Edward I. Masterman* with him) for the plaintiff.

*Carol J. Muller,* City Solicitor, for the defendant.

ABRAMS, J. We granted the plaintiff's application for further appellate review to determine whether a verdict for the plaintiff was warranted and should be allowed to stand. The Appeals Court concluded that the evidence was insufficient, see *Abraham* v. *Woburn,* 10 Mass. App. Ct. 416 (1980), and ordered judgment for the defendant. We conclude that the evidence was sufficient to submit the case to the jury, that there was no reversible error in the admission of evidence, and that the instructions to the jury were correct. Therefore, we affirm the judgment of the Superior Court.

The complaint was brought under G. L. c. 269, § 8, as amended by St. 1965, c. 647, § 3, which imposes liability on a municipality for damage caused by five or more persons "riotously or tumultuously assembled." The evidence, viewed in the light most favorable to the plaintiff, see *Boyle* v. *Wenk,* 378 Mass. 592, 593 (1979); *Uloth* v. *City Tank Corp.,* 376 Mass. 874, 876 (1978), reveals that during the summer of 1970, youth gangs roamed throughout the city of Woburn vandalizing both public and private property, setting fires, and exploding firebombs. The "rebellious spirit" of the youths was well-known to public officials and had received considerable publicity in the local newspaper.

Abraham owned a bowling alley located 100 to 300 yards from a spot where youths regularly congregated. After the bowling leagues ended their season, the bowling alley closed for the summer. At that time Abraham chained and locked doors, and placed plywood over windows. He arranged to have the manager of the bowling alley inspect the building twice a day, and Abraham himself inspected it weekly. Even with these precautions, the bowling alley was the target of minor acts of vandalism on six to eight occasions that summer. The police, who regularly patrolled the area, notified Abraham whenever a problem was discovered.

On August 29, 1970, the Saturday prior to the incident, Abraham inspected the property, and found it in order.

The property was last inspected in the late afternoon or early evening of September 4 by the manager, and Abraham was not notified of any problem. However, a gang was seen near there one and one-half days prior to the destruction of the property.

On the morning of September 5, Abraham received a telephone call from local officials summoning him to the bowling alley. He arrived and found that the exterior glass was broken; the front door was smashed; two large roof signs were destroyed; ceiling tiles were torn down; the interior glass was almost entirely broken; the rugs in the lobby were soaked with water, paint, and syrup; heavy vending machines were tipped over; metal T-bars and grid work which supported the ceiling were torn down and twisted; wires and metal ducts were hanging loose from the ceiling; sinks, toilets, and other fixtures were twisted and cracked; all twenty-six bowling lanes were damaged, bowling equipment and electric control equipment for keeping score were heavily damaged; bowling shoes and other items of equipment were strewn about. In short, the bowling alley looked as if "a bomb [had] hit the place." The evidence favorable to the plaintiff permitted the inference that the damage took place over a short period of time.

The mayor of the city in 1970, who as such was also the executive head of the police department, testified without objection that the damage had been caused by a "riotous act or a cyclone." He defined "riotous act" in part as damage to property by a large group of people. The city editor of the Woburn Daily Times testified, again without objection, that the damage was caused by "the riotous gangs that hang around and hung around that section and other sections of the City."[1]

---

[1] The city argues that these statements are hearsay, and that without them the remaining evidence is insufficient to support the jury's verdict. However, the city did not register an objection to the testimony at trial, and if no timely objection is lodged, any challenge to the admission of the testimony is not properly before us. See Mass. R. Civ. P. 46, 365 Mass. 811 (1974). See also Proposed Massachusetts Rules of Evidence 103 (a)

*The motions for directed verdict or judgment notwithstanding the verdict.* At the close of the plaintiff's evidence and again after all the evidence, the city moved unsuccessfully for a directed verdict. Mass. R. Civ. P. 50 (a), 365 Mass. 814 (1974). Cf. *Martin* v. *Hall*, 369 Mass. 882 (1976). After the jury returned a verdict of $147,750 for Abraham,[2] the city moved for judgment notwithstanding the verdict, or for a new trial. Mass. R. Civ. P. 50 (b), 365 Mass. 814 (1974). That motion was likewise denied. In reviewing the denial of the city's motion for judgment notwithstanding the verdict, the same standard applies as would apply to a review of a motion for a directed verdict,[3] *D'Annolfo* v. *Stoneham Hous. Auth.*, 375 Mass. 650, 657 (1978); J.W; Smith & H.B. Zobel, Rules Practice § 50.13, at 209 (1977), namely, whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff." *Poirier* v. *Plymouth*, 374

---

and (d) (1980); J.W. Smith & H.B. Zobel, Rules Practice § 46.2 (1977). The purpose of requiring an objection is to afford the trial judge an opportunity to act promptly to remove from the jury's consideration evidence which has no place in the trial. Absent objection, the hearsay evidence was properly admitted, and the jurors were entitled to give it such probative effect as they deemed appropriate. *Freyermuth* v. *Lutfy*, 376 Mass. 612, 616-617 (1978). *Regan* v. *John J. Amara & Sons*, 348 Mass. 734 (1965). *O'Kane* v. *Travelers Ins. Co.*, 337 Mass. 182 (1958). W.B. Leach & P.J. Liacos, Massachusetts Evidence 72 (4th ed. 1967).

[2] General Laws c. 269, § 8, limits the liability of a municipality to "the amount of three fourths of the value of the property destroyed or of the amount of such injury thereto." Accordingly, the judge reduced the damage award to $110,802.50. There was apparently a clerical mistake, for the correct figure appears to be $110,812.50. See Mass. R. Civ. P. 60 (a), 365 Mass. 828 (1974).

[3] The judge properly denied the motions for a directed verdict. "The better procedure 'in a case in which it is a close question whether the standard for granting a directed verdict is met is to allow the matter to go to the jury. If the judge then decides that the jury's verdict cannot stand, a motion for judgment notwithstanding the verdict may be allowed.'" *Feltch* v. *General Rental Co.*, ante 603, 611-612 (1981), quoting from *Smith* v. *Ariens Co.*, 375 Mass. 620, 627 (1978).

Mass. 206, 212 (1978), quoting from *Raunela* v. *Hertz Corp.,* 361 Mass. 341, 343 (1972).

The city argues that the plaintiff failed to prove that the loss sustained was the result of a riotous or tumultuous assembly, as required by G. L. c. 269, § 8, and not the result of vandalism or malicious mischief. The statute does not define a riotous or tumultuous assembly;[4] however, we have said that the phrase "riotously or tumultuously assembled" should be read "conjunctively to describe the offence of an unlawful assembly which has proceeded to execute an unlawful purpose in a way that has resulted in the destruction of property or of injury thereto, and in a manner to give firm and courageous persons in the neighborhood of such assembly reasonable grounds to apprehend a breach of peace in consequence of it." *Yalenezian* v. *Boston,* 238 Mass. 538, 542-543 (1921).[5] We have also stated that "[p]ersons having lawfully come together and being lawfully together, may, thereupon, become an unlawful assembly and commit a riot, although they had not that purpose when they assembled." *Yalenezian, supra* at 543.

Further, the statute does not require the plaintiff to prove that the public was put in fear by the rioters: "[T]here may be a riot without terrifying any one." *Commonwealth* v. *Runnels,* 10 Mass. 518, 519 (1813). See *Yalenezian, supra* at 542-543; Note, Communal Liability for Mob Violence,

---

[4] General Laws c. 269, § 8, as amended by St. 1965, c. 647, § 3, provides: "If property of the value of fifty dollars or more is destroyed or if property is injured to that amount by five or more persons who are riotously or tumultuously assembled, the town within which the property was situated shall, if the owner of such property uses all reasonable diligence to prevent its destruction or injury, and to procure the conviction of the offenders, be liable to indemnify the owner thereof in tort to the amount of three fourths of the value of the property destroyed or of the amount of such injury thereto, and may recover the same against any or all of the persons who destroyed or injured said property."

[5] *Yalenezian* v. *Boston,* 238 Mass. 538 (1921), was decided under R. L. c. 211, § 8 (1902), which is identical in substance to G. L. c. 269, § 8, with only one significant difference. Under the previous version, the riotous or tumultuous assembly had to include twelve or more persons; the number was reduced to five or more by St. 1965, c. 647, § 3.

49 Harv. L. Rev. 1362, 1364 (1936) (suggesting it is "doubtful whether the activities and character of the mob must be such as would put in fear a man of reasonable courage"). The issue is whether the evidence presented permitted the jury reasonably to infer that Abraham's property was destroyed "by five or more persons who [were] riotously or tumultuously assembled," as those words appear in G. L. c. 269, § 8.

The city claims that the jury could not have found that Abraham's property was damaged by a riotous or tumultuous assembly of five or more persons, since there was no direct testimony of such a gathering. However, we have long adhered to the rule that adequate proof in civil and criminal cases may come from either direct or circumstantial evidence, or both.[6] See, e.g., *Commonwealth v. Montecalvo,* 367 Mass. 46, 54 (1975); *Sarkesian v. Cedric Chase Photographic Laboratories, Inc.,* 324 Mass. 620 (1949); *Sargent v. Massachusetts Accident Co.,* 307 Mass. 246, 250-251 (1940); *Murphy v. Bay State Wine & Spirit Co.,* 212 Mass. 285 (1912); *Commonwealth v. Kennedy,* 170 Mass. 18, 25 (1897); *Commonwealth v. Webster,* 5 Cush. 295, 310-320 (1850). See generally 1 J. Wigmore, Evidence § 26 (3d ed. 1940). The probative value of circumstantial evidence "has never been seriously questioned," *Commonwealth v. Montecalvo, supra; Commonwealth v. Medeiros,* 354 Mass. 193, 197 (1968), cert. denied sub nom. *Bernier v. Massachusetts,* 393 U.S. 1058 (1969); *Commonwealth v. Swartz,* 343 Mass. 709, 711 (1962), and the persuasive value of circumstantial evidence may exceed that of direct evidence, W.B. Leach & P.J. Liacos, Massachusetts Evidence 293-294 (4th ed. 1967).

---

[6] We have affirmed convictions of murder in the first degree based solely on circumstantial evidence, see, e.g., *Commonwealth v. Smith,* 350 Mass. 600 (1966); *Commonwealth v. Tucker,* 189 Mass. 457 (1905); *Commonwealth v. Webster,* 5 Cush. 295, 310-320 (1850), and have similarly upheld convictions of other lesser offenses, see, e.g., *Commonwealth v. Monahan,* 349 Mass. 139 (1965) (larceny and conspiracy); *Commonwealth v. Jeffries,* 7 Allen 548 (1863) (fraud and false pretenses).

In this case, "[p]roof of the crucial facts depended on the inferences which could reasonably be drawn from the circumstances. 'When a material fact is not proved by direct testimony, but is left to be inferred from the facts directly sworn to, the inference need not be a necessary one. There is a case for the jury, unless the inference either is forbidden by some special rule of law, or is declared unwarranted because too remote, according to the ordinary course of events. If there is a case for the jury, they are at liberty to use their general knowledge in determining what inferences are established . . . and the facts inferred by them are as properly proved as if directly testified to.'" *Commonwealth* v. *Bonomi*, 335 Mass. 327, 355-356 (1957), quoting from *Commonwealth* v. *Doherty*, 137 Mass. 245, 247 (1884). See *Commonwealth* v. *Beckett*, 373 Mass. 329, 341 (1977); *Commonwealth* v. *Medeiros*, 354 Mass. 193, 197 (1968). A construction of G. L. c. 269, § 8, which limits the plaintiff's proof to direct evidence, would be a major departure from precedent, a departure which we decline to make.

As we read the record, the facts and circumstances presented by the plaintiff, *supra* at 725-726, permitted the judge to submit the case to the jury, and permitted the jury reasonably to infer that the bowling alley had been damaged by five or more persons riotously or tumultuously assembled. A witness testified that the damage was caused by a riotous act which he defined as damage to property caused by "a large group of people." Given this evidence, the evidence of the history of roving gangs in Woburn, and the near-total destruction of the bowling alley, the jury reasonably could have found that only a group of five or more could have inflicted the damage in the time available from the last inspection on Friday night to the discovery of the damage early Saturday morning. As long as the jury's verdict is supported by reasonable inferences, we will not substitute our interpretation of the facts for theirs. "[W]e have no authority to take upon ourselves the duties of a tribunal of fact, and to determine what verdicts should have been rendered by the jury." *Electric Welding Co.* v. *Prince*, 200 Mass. 386, 392 (1909).

The city argues that allowing the plaintiff to recover would be burdensome to the taxpayers. By statute, municipalities long have been held liable for damage to property caused by a riot.[7] See Note, Municipal Liability for Riot Damage, 81 Harv. L. Rev. 653 (1968); Note, Riot Insurance, 77 Yale L.J. 541, 552-553 (1968); Annot., Municipal Liability for Property Damage under Mob Violence Statutes, 26 A.L.R.3d 1198 (1969). The purpose of statutes imposing communal liability for riot damage is to "make good, at the public expense, the losses of those who may be so unfortunate, as without their own fault to be injured in their property by acts of lawless violence of a particular kind which it is the general duty of the government to prevent." *Yalenezian* v. *Boston*, 238 Mass. 538, 541 (1921), quoting from *Underhill* v. *Manchester*, 45 N.H. 214, 221 (1864). Accord, *Chicago* v. *Sturges*, 222 U.S. 313, 322 (1911) (the riot compensation law "is but a recognition of the obligation of the State to preserve social order and the property of the citizen against the violence of a riot or a mob"). See generally Note, Liability of the Municipality for Mob Violence, 6 Fordham L. Rev. 270, 279 (1937). There is no requirement that the damage had to have been caused by a riot of which the municipality had, or should have had knowledge, or that the municipality could have prevented the damage by the exercise of reasonable diligence. It is not for the judiciary to override legislative policy because the policy is unappealing or expensive. In sum, "[a]ny change in the legisla-

---

[7] Statutes imposing liability for damage to property by riot first appeared in England in 1714, see 1 Geo. 1, st. 2, c. 5, and continue to the present time, although they have been modified by Parliament on several occasions, see 7 & 8 Geo. 4, c. 31 (1827); 2 & 3 Will. 4, c. 72 (1832); Riot (Damages) Act of 1886, 49 & 50 Vict. c. 38. See generally Note, Municipal Liability for Riot Damage, 16 Hastings L.J. 459, 460 (1965).

The Massachusetts statute was enacted in 1839 "partly . . . as a result of the anti-Catholic riots in Charlestown in 1834, when the Ursuline Convent was burned, and the Broad Street riot of 1837, when several buildings were burned." Discussion of the Recent Opinion as to Municipal Liability for Looting by Rioters, 6 Mass. L.Q. (No. 5) 205, 211 (1921). See *Abraham* v. *Woburn*, 10 Mass. App. Ct. 416, 421-423 (1980).

tive policy as expressed in the statute is for the Legislature."
*Feltch* v. *General Rental Co., ante* 603, 609 (1981).[8]

*Charge to the jury.* There is no merit in the city's arguments with respect to the charge to the jury. We need not decide challenges to jury instructions in the absence of a specific request or objection properly presented to the judge. Mass. R. Civ. P. 51 (b), 365 Mass. 816 (1974). See *Ezekiel* v. *Jones Motor Co.,* 374 Mass. 382, 392-393 (1978); *Kane* v. *Fields Corner Grille, Inc.,* 341 Mass. 640, 646 (1961). The only objection presented at trial was to the judge's failure to instruct the jury that "those assembled must have intended to help one another by force if necessary against any person who should oppose them in the execution of their common purpose," and "[t]hose assembled must have not only used force or violence in demolishing and destroying the plaintiff's property but must have displayed such force or violence in such a manner as to have alarmed at least one person of reasonable firmness and courage." The propriety of identical requests was before the court in *Yalenezian,* 238 Mass. at 543, and those requests were held to be rightfully refused. On the authority of *Yalenezian, supra,* the judge below correctly denied the city's request. The judgment of the Superior Court is affirmed.

*So ordered.*

HENNESSEY, C.J. I dissent. The direct evidence here, considered with all inferences that could fairly be drawn, is not sufficient to warrant a verdict for the plaintiff under G. L. c. 269, § 8.

---

[8] Several States, including California, Illinois, and Louisiana, have repealed statutes imposing liability on municipalities for riot damage. See Cal. Gov't Code §§ 50140-50145 (Deering 1949), repealed by Cal. Stats. 1963, c. 1681, § 17; Ill. Rev. Stat. ch. 38, § 25-3 (1963), repealed by Laws 1967, at 2365, effective July 31, 1967; La. Rev. Stat. § 33:5065 (1950), repealed by Acts 1966, No. 458, § 1. It is not clear whether the repeal was predicated on the availability of insurance for this type of property damage. See generally Note, Riot Insurance, 77 Yale L.J. 541 (1968).

We have stated in *Yalenezian* v. *Boston,* 238 Mass. 538, 542-543 (1921), that the statutory words "riotously or tumultuously assembled" are to be read "conjunctively," to describe "an unlawful assembly which has proceeded . . . in a manner to give firm and courageous persons in the neighborhood of such assembly reasonable grounds to apprehend a breach of peace." This definition accords with a legislative intent that the municipality should be liable only when the destructive event was so open and notorious that responsible authorities knew or should have known of the event.

The evidence and the permissible inferences here establish no more than extensive vandalism performed in the interior of a building, and neither seen nor heard by any "persons in the neighborhood." This is a far cry from a showing that the authorities knew or should have known of the occurrence. The legislative purpose of such a statute is obvious: the municipality, on notice of the danger, fails to protect the citizen's property at the risk of civil liability. The construction which the majority reach here comes close to imposing an insurer's obligation upon the municipality. I have in mind the frequent and clandestine acts of vandalism today in homes and buildings.

I emphasize that, perhaps contrary to the reasoning of the Appeals Court, I (like the majority of this court) would of course allow the plaintiff to prove his case by fair inferences as well as direct evidence. Even under that approach, the plaintiff fails, in my opinion; a verdict for the municipality should have been directed.