PAUL G. FERRAGAMO, administrator,[1] vs. MASSACHUSETTS
BAY TRANSPORTATION AUTHORITY.

Suffolk.   March 6, 1985. — August 8, 1985.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Warranty. Negligence,* Toxic chemical, Comparative. *Sale,* Warranty.
*Uniform Commercial Code,* Warranty. *Massachusetts Bay Transporta-
tion Authority. Words,* "Merchant."

The Massachusetts Bay Transportation Authority was a "merchant," for
    purposes of the implied warranty of merchantability under G. L. c. 106,
    § 2-314 (1), in the sale from time to time of its discarded trolley cars
    for use as scrap metal. [585-589]
Disclaimers of warranty in a contract for the sale of discarded trolley cars
    by the Massachusetts Bay Transportation Authority did not preclude an
    action by the personal representative of a deceased employee of the
    buyer, whose death allegedly resulted from inhaling toxic fumes while
    salvaging scrap metal from one of the cars. [589-591]
In an action against the Massachusetts Bay Transportation Authority based
    on negligence and breach of warranty the evidence sufficed to permit
    the jury to find that the plaintiff's decedent, a twenty year old salvage
    worker, died as a result of exposure to toxic fumes released while he
    was dismantling a trolley car which the authority had sold to his employer
    for use as scrap metal. [591-592]
A jury finding that a plaintiff's decedent had been contributorily negligent
    by thirty-five percent did not bar the plaintiff from recovering on a claim
    against the Massachusetts Bay Transportation Authority for breach of
    warranty in the sale of a discarded trolley car for use as scrap metal,
    where there was no indication in the record that the decedent, a salvage
    worker, was aware of the presence of a potentially lethal chemical in
    the car yet proceeded unreasonably to dismantle it. [592-593]

CIVIL ACTION commenced in the Superior Court Department
on July 11, 1978.
The case was tried before *Paul K. Connolly,* J.

[1] Of the estate of Michael Ferragamo.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Thomas F. Maffei (Thomas T. Olivier* with him) for the defendant.

*Andrew C. Meyer, Jr.,* for the plaintiff.

ABRAMS, J.  On August 16, 1976, Michael Ferragamo died of respiratory failure after spending three weeks dismantling used trolley cars purchased by his brother, the plaintiff in this action, from the Massachusetts Bay Transportation Authority (MBTA). A jury found the defendant MBTA liable for negligence and breach of warranty resulting in the death of Michael Ferragamo. The judge granted the defendant's motion for judgment notwithstanding the verdict only with respect to those counts sounding in breach of warranty. Both parties appealed. We reverse the judgment notwithstanding the verdict on the breach of warranty claims, and affirm the judgment on the negligence claims.

The jury could have found the facts to be as follows. In June, 1976, the defendant sent Paul Ferragamo an invitation to bid on eight trolley cars, no longer being used in the subway system.[2] Paul Ferragamo, as the successful bidder, signed a contract of sale which described the items purchased as "8-scrap P.C.C. Cars complete 'As is' Where is." The contract further provided that "[a]ll property listed herein is offered for sale 'as is' and 'where is' and without recourse against the Authority. The Authority makes no guaranty, warranty, or representation, express or implied, as to the quantity, kind, character, quality, weight, size or description of any of the property . . . ." The purchaser was to be "solely responsible for all injuries to persons or damage to property occurring on account of, or in connection with" dismantling the cars and removing them from MBTA premises.

Car No. 3298, one of the eight cars purchased by Paul Ferragamo, had been "involved in [a] fire at the Kenmore Square M.B.T.A. station in July of 1975." The jury could

---

[2] The parties stipulated to the fact that "[t]he M.B.T.A. sells almost all of its old M.B.T.A. trolley cars for scrap."

have found that as a result of the fire, forty-five firemen, several passengers, and a number of MBTA employees had been treated for possible exposure to polyvinyl chloride (PVC) fumes;[3] that a chemist had determined that there was some "25.7 lbs. of PVC compound" in "the area of the fire"; and that Car No. 3298 was covered with drippings of melted plastic.

It was one year after the fire that Paul Ferragamo engaged his twenty year old brother, the decedent, to assist in dismantling the eight trolley cars at the defendant's Watertown yard. The decedent completed work on the first two cars without incident. The plaintiff and the decedent began to dismantle Car No. 3298 during the week of August 8, 1976. They first cleared the debris from the car and scraped off as much of the plastic drippings as possible, whereupon the decedent proceeded to cut through the remaining plastic with an acetylene torch. Wearing a dust mask only intermittently, the decedent cut the car from Monday through Friday in very hot weather. His voice became progressively more hoarse during the week and he experienced considerable shortness of breath and a sore throat. On the morning of August 16, 1976, the decedent was gasping for breath in his sleep. He was then taken by ambulance to the hospital where he died shortly thereafter "as a result of acute respiratory failure." On the day following his brother's death, Paul Ferragamo spoke with the MBTA foreman at the Watertown yard and told him about the death. Paul Ferragamo was then informed for the first time that "there was something wrong with that car, that there had been PVC near it or in it . . . ."

The plaintiff filed this action on July 11, 1978. The complaint embraced four counts. In Counts I and III, the plaintiff sought damages for the decedent's wrongful death and conscious suffering occurring as a result of the defendant's negligence.

---

[3] According to one expert witness, polyvinyl chloride is "a material that is used widely in synthetic materials and specifically in plastics," and, which, on thermal degradation, releases hydrogen chloride gas. That gas "in high enough doses, in a high enough concentration, . . . will cause serious lung damage in practically everybody that inhales it."

Counts II and IV sought damages on a theory of breach of warranty.[4] On May 6, 1983, a jury returned verdicts for the plaintiff on all four counts while finding the decedent contributorily negligent by thirty-five percent on the two negligence counts.

On May 16, 1983, the MBTA moved for judgment notwithstanding the verdicts. The judge allowed the motion as to Counts II and IV — the warranty counts — but denied the MBTA's motion as to Counts I and III — the negligence counts. He ruled "that on the facts in this case the defendant MBTA is not a 'Merchant' as that term is defined in M.G.L.A. Chap. 106, Sec. 2-104 (1). Since the defendant is not a 'merchant' the provisions of M.G.L.A. Chap. 106, Sec. 2-314 do not apply and there was no implied warranty that the car in question was fit for the ordinary purpose for which it was sold." The judge further held that although "[t]he evidence on this question is slight," there was "enough to warrant a jury to find that PVC was present on or in the car; that this presence was known or should have been known to the defendant and imposed on the defendant a duty to warn of the danger involved in cutting up the car with an acetylene torch." Both parties then filed notices of appeal.[5] We transferred the matter to this court on our own motion.

On appeal, the plaintiff argues that the MBTA is a merchant, for purposes of the implied warranty of merchantability set

---

[4] The complaint alleged a breach both of an implied warranty of merchantability and of an implied warranty of fitness for a particular purpose. The judge charged the jury on both types of warranty, but the special verdicts on Counts II and IV did not distinguish between the two. In his memorandum of decision on the defendant's motion for judgment notwithstanding the verdict, the judge stated that there was no "evidence on the part of the plaintiff that the buyer relied 'on the seller's skill or judgment to select or furnish suitable' cars." G. L. c. 106, § 2-315. The plaintiff does not challenge that ruling on this appeal.

[5] In response to the plaintiff's motion for reconsideration, on August 3, 1983, the judge affirmed his "action in granting the defendant's" motion for judgment notwithstanding the verdict as to Counts II and IV of the complaint.

forth in G. L. c. 106, § 2-314 (1) (1984 ed.),[6] and that the verdicts on the breach of warranty claims must thus be reinstated. The defendant contends that the trial court judge ruled correctly; that even if the MBTA were a merchant, the disclaimers in the contract of sale were effective; that the jury's special finding of comparative negligence ought either to bar the plaintiff's recovery for breach of warranty or to reduce that recovery by a factor proportionate to the decedent's negligence; and that, in any event, there was insufficient evidence for the jury to find that PVC was present on or in Car No. 3298 at the time Michael Ferragamo worked on it.

1. *The MBTA's status as a "merchant."* The parties do not dispute that the MBTA may not be held liable for breach of an implied warranty of merchantability under G. L. c. 106, § 2-314 (1), unless the MBTA is a "merchant," within the meaning of the statute. The MBTA maintains, in essence, that because its sales of used trolley cars are "incidental" to its primary business as a matter of law, it cannot be viewed as a merchant of scrap trolley cars. We disagree.

The judge submitted the question whether "the M.B.T.A. was a merchant with respect to the sale of Car 3298" to the jury.[7] Only in his memorandum of decision on the motion for judgment notwithstanding the verdict did he rule that, as a matter of law, the MBTA was not a merchant. That ruling was incorrect.

The definition of "merchant" is set forth at G. L. c. 106, § 2-104 (1) (1984 ed.): "'Merchant' means a person who deals

---

[6] General Laws c. 106, § 2-314 (1), provides in relevant part: "Unless excluded or modified by section 2-316, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."

[7] The judge approached the question of the MBTA's merchant status as a mixed question of law and fact, and we review the question on that basis. We leave open the possibility that, in other circumstances, the determination of merchant status might constitute solely an issue of law. See, e.g., *County of Milwaukee* v. *Northrop Data Syss.*, 602 F.2d 767, 771 (7th Cir. 1979); *Cudahy Foods Co.* v. *Holloway*, 55 N.C. App. 626, 629 (1982); *Nelson* v. *Union Equity Coop. Exch.*, 548 S.W.2d 352, 354 (Tex. 1977). See generally 1 R.A. Anderson, Uniform Commercial Code § 2-104:12 (3d ed. 1981).

in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill." Further, a warranty of merchantability under G. L. c. 106, § 2-314, is implied only "if the seller is a merchant with respect to goods of that kind." "Obviously this qualification restricts the implied warranty to a much smaller group than everyone who is engaged in business and requires a professional status as to particular kinds of goods." G. L. c. 106, § 2-104, comment 2, at 190 (Law. Coop. 1984).

Thus, the dual requirements of G. L. c. 106, §§ 2-104 (1) and 2-314, lead us to ask whether there was evidence that the MBTA "regularly deals in goods of the kind involved or otherwise has a professional status with regard to the goods involved such that [it] could be expected to have specialized knowledge or skill peculiar to those goods." *Crooper* v. *Rego Distribution Center, Inc.*, 542 F. Supp. 1142, 1154 (D. Del. 1982). Moreover, that inquiry "is of necessity highly dependent on the factual setting of the transaction in question. Consequently, whether a person is a merchant is to be determined according to the circumstances of each case." 1 R.A. Anderson, Uniform Commercial Code § 2-104:25 (3d ed. 1981). Particularly with respect to the seller of used equipment is such a determination contingent on the factual background. See *id.* at §§ 2-104:29 — 2-104:45. We conclude that the instant circumstances warranted the jury's determination that the MBTA is a merchant with respect to its sales of used trolley cars.

The jurors could have found the following facts: First, the MBTA stipulated that it "sells almost all of its old M.B.T.A. trolley cars for scrap." Second, the MBTA had solicited a bid from the plaintiff, among others, on the eight trolley cars to be sold. Third, the eight trolley cars were purchased by the MBTA in 1951 and were operated and repaired by MBTA employees for approximately twenty-five years. Fourth, MBTA agents had originally designed the cars which were then built to their specifications.

This concatenation of facts and the reasonable inferences drawn from them permitted the jury to find that the MBTA is a merchant with respect to used trolley cars. "The term 'merchant' . . . roots in the 'law merchant' concept of a professional in business. The professional status under the definition may be based upon specialized knowledge as to the goods . . . ." G. L. c. 106, § 2-104, comment 2, at 189 (Law. Coop. 1984). "Professionalism, special knowledge and commercial experience are to be used in determining whether a person in a particular situation is to be held to the standards of a merchant." *Decatur Coop. Ass'n* v. *Urban*, 219 Kan. 171, 176-177 (1976). "[T]he test is whether a person is so experienced and knowledgeable under the circumstances that he should be charged with the more substantial burden imposed upon a merchant" (citations omitted). *Sea Harvest, Inc.* v. *Rig & Crane Equip. Corp.*, 181 N.J. Super. 41, 48 (1981).

Here, the MBTA was highly "experienced and knowledgeable" with respect to the goods involved. The MBTA had, through its employees, a long-term and thorough acquaintance with the cars sold to the plaintiff: MBTA employees had contributed to the manufacture of the cars,[8] and had operated, repaired, refurbished, and maintained them for twenty-five

---

[8] One employee of the MBTA testified as follows:

Q. "And are you familiar with the cars known as Presidential Conference Committee Cars?"

A. "Somewhat."

Q. "And did you have any responsibility for the procurement, purchase, of those cars in the early fifties?"

A. "I was involved in the general design. We had a team at that time. We have a group, a team, and I was one of that group."

Q. "And did you prepare some sort of design drawings for the Presidential Conference Cars?"

A. "Yes."

Q. "Would you, for the jury's benefit, would you give them a bit of history of the M.B.T.A.'s acquisition of the PCC cars in the late forties and early fifties?"

A. "Well, the cars that we were operating were quite old, and we saw fit to make us — update out system, and that's what we did. We prepared specifications, and we proceeded to have people build the cars."

years.[9] The MBTA asserts that is cannot be a merchant because its principal business is solely the "operation of a mass transportation system" — not the sale of scrap. But while the MBTA may not be a merchant of scrap, there was sufficient evidence to conclude that it was a merchant of used trolley cars. Its supervision of a mass transit system implies professional expertise with respect to the medium of transit, namely trolley cars.[10] Indeed, by virtue of its very assertion that its business is the "operation of a mass transportation system," the MBTA "by [its] occupation holds [itself] out as having knowledge or skill peculiar to the . . . goods involved in the transaction." G. L. c. 106, § 2-104 (1). See 1 R.A. Anderson, *supra* § 2-104:17.

The MBTA next maintains that "[t]he fact that [it] occasionally sells its old trolley cars for scrap does not render the MBTA a merchant of scrap goods." But "the fact that a person

---

[9] Another employee of the MBTA testified as follows:

Q: "Can you tell me what your responsibilities have been over the last 15 or 20 years on the T?"

A: "I've been working on the old streetcars, what we call the PCC's for the past 20 years."

. . .

Q: "And can you give the jury an explanation of the kinds of things that were done to these — to this car, as well as the others in that series, over the period of time since they were bought by the T?"

A: "Well, one of the major overhauls began in 1961 after they were ten years old. They were taken to our Everett shops for overhauling, reconditioning. They painted the exterior and interior on them. Laid new tile, rubber tile flooring, wall to wall, and at a later date, they started installing the fiberglass seats in them. They overhauled the electrical and air components on those cars, installed new motors, new wheels, and then they were returned to our reservoir car house where I was inspector foreman."

[10] The MBTA cites several cases for the proposition that incidental sales of used equipment do not place the seller in the position of a merchant under G. L. c. 106, § 2-314 (1). See, e.g., *Bruce* v. *Martin-Marietta Corp.*, 544 F.2d 442 (10th Cir. 1976) (airline not a merchant in isolated sale of a used aircraft which it neither designed, manufactured, nor altered); *Joyce* v. *Combank/Longwood*, 405 So. 2d 1358 (Fla. Dist. Ct. App. 1981) (bank making occasional sales of repossessed automobiles not a merchant); *Allen* v. *Nicole, Inc.*, 172 N.J. Super. 442 (1980) (seller of amusement ride not a merchant where he lacked specialized knowledge or skill peculiar to goods involved). In each of these cases, the seller lacked the professional expertise, with respect to the goods sold, which the MBTA possesses in the instant circumstances.

is not in the business of buying and selling a particular kind of goods does not mean that he is not a merchant with respect to such goods." 1 R.A. Anderson, *supra* at § 2-104:14. The only apparent sine qua non of merchant status under G. L. c. 106, § 2-314 (1), is that the sale at issue not be "an isolated sale of goods." G. L. c. 106, § 2-314, comment 3, at 466 (Law. Coop. 1984). It appears from the record that the MBTA sold off its discarded cars; and, although the record does not reflect the number of occasions on which those cars were sold, the jurors could have inferred that the instant sale was not an isolated transaction. Thus, the sporadicity of sales does not vitiate the jurors' conclusion that the MBTA is a merchant. Because the MBTA possessed specialized knowledge of trolley cars, and because the transaction was not an isolated sale, we conclude that the jury could determine that the MBTA was a merchant with respect to used trolley cars.

2. *The effect of the disclaimers.* The judge stated that "[i]f [G. L. c. 106, § 2-316] has any relevancy to the negligence issue I rule that the decedent employee not being a party to the contract of sale of the car involved is not bound by the terms of the contract." In view of our conclusion that the MBTA is a merchant under G. L. c. 106, § 2-314 (1), the effect of the disclaimers present in the contract of sale is now indeed relevant. The defendant argues "that warranty disclaimers should apply against any person entitled to bring an action for damages against a seller under [G. L. c. 106,] § 2-318."[11] The MBTA thus asserts that because it sold the trolley cars "as is," the plaintiff's breach of warranty claims are effectively barred.

---

[11] General Laws c. 106, § 2-318 (1984 ed.), provides in relevant part: "Lack of privity between plaintiff and defendant shall be no defense in any action brought against the manufacturer, seller, lessor or supplier of goods to recover damages for breach of warranty, express or implied, or for negligence, although the plaintiff did not purchase the goods from the defendant if the plaintiff was a person whom the manufacturer, seller, lessor or supplier might reasonably have expected to use, consume or be affected by the goods. A manufacturer, seller, lessor or supplier may not exclude or limit the operation of this section."

We reject this reasoning. We assume, without deciding, that the disclaimer here at issue fully satisfied the requirements of G. L. c. 106, § 2-316.[12] The narrow question is whether such a disclaimer necessarily precludes an action in breach of warranty against the seller by the buyer's employee who has suffered a personal injury. We conclude that it does not.

Section 2-316 of G. L. c. 106 "does not undertake, nor does any other section of the [Uniform Commercial Code] undertake, to specify who shall and who shall not be bound by an exclusion of warranties which meets the requirements of section 2-316." *Velez* v. *Craine & Clark Lumber Corp.*, 33 N.Y.2d 117, 124 (1973). The general rule is that "[t]he employee of the buyer is not bound by a disclaimer of warranties in the sales contract." 3 R.A. Anderson, Uniform Commercial Code § 2-316:56 (3d ed. 1983). The rationale supporting that rule is sound. "The reasoning is that disclaimers are a subject of agreement, and not binding on one not party to the agreement. The dual origin of warranty, in both tort and contract law, has been a powerful argument in eliminating the privity requirement, but it has not been alluded to in disposing of the effect on third parties of disclaimer provisions." 2A L.R. Frumer & M.I. Friedman, Products Liability § 19.07[4], at 5-199 (1984). But more than the absence of agreement between the buyer's employee who sustains a personal injury and the seller of the defective product is the fact that a disclaimer is irrelevant in an action which, although framed as one for breach of warranty, is based on strict tort liability. See L.R. Frumer & M.I. Friedman, *supra* at § 19.07[4], 5-200. "The Legislature has made the Massachusetts law of warranty congruent in nearly all respects with the principles expressed in Restatement (Second) of Torts § 402A (1965)." *Back* v. *Wickes Corp.*, 375 Mass. 633, 640 (1978). "We see no necessity to labor the point that, in the ab-

---

[12] Subsection (3) (*a*) of G. L. c. 106, § 2-316 (1984 ed.), is pertinent to the instant action: "[U]nless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is,' 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty. . . ."

sence of special circumstances not present here, buyer and seller cannot contract to limit the seller's exposure under strict products liability to an innocent user or bystander." *Velez* v. *Craine & Clark Lumber Corp., supra* at 125. Accordingly, the disclaimer in the sales contract between the MBTA and the plaintiff is inapplicable in the circumstances of this action.

3. *Sufficiency of the evidence.* The MBTA next urges that the "plaintiff failed to produce more than 'a mere scintilla' of evidence" that Michael Ferragamo's death was caused by the presence of PVC on or in Car No. 3298, and that a directed verdict for the MBTA therefore was required on all counts. See *Hartmann* v. *Boston Herald-Traveler Corp.*, 323 Mass. 56, 59 (1948). We have reviewed the record in its entirety and discern no error.

In determining whether the jury should have been allowed to decide the issue of negligence, "[t]he question is whether the evidence, construed most favorably to the plaintiff, could not support a verdict for the plaintiff. *Grant* v. *Carlisle*, 328 Mass. 25 (1951). More specifically, the test has been stated as whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.' *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972). That the inferences be reasonable requires that they be based on 'probabilities rather than possibilities' and not the result of 'mere speculation and conjecture.' *Alholm* v. *Wareham*, 371 Mass. 621, 627 (1976)." *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978). Accord *Abraham* v. *Woburn*, 383 Mass. 724, 727-728 (1981).

We agree with the judge's own observation that the evidence, although "slight," sufficed to permit the jury to find that the decedent died as a result of exposure to toxic fumes released when he burned through PVC present on or in Car No. 3298. First, the plaintiff introduced an internal memorandum of the MBTA dated July 29, 1975, stating that a company chemist had "determined that in the area of the fire, which is about 200 feet in scope, there was 25.7 lbs. of PVC compound." Second, the plaintiff testified that, after the death of his brother,

he was told by one MBTA supervisor "that there was something wrong with that car, that there had been PVC near it or in it" and that a second foreman "asked me didn't we know anything about the plastics in the car." Last, one expert witness testified as follows: "The cause of death is most likely polyvinyl chloride intoxication. I think in a young person who's been healthy like this, and then exposed to something like this, who develops the very classic symptoms of polyvinyl chloride toxicity, that that is the likely cause of death." Another expert witness stated: "I'd say PVC poisoning is the only logical or likely one, the only sensible explanation in this case."[13]

Given this evidence, the jury reasonably could have found that only the presence of PVC on or in Car No. 3298 at the time the decedent worked on it could account for the rapid deterioration and sudden death of this previously healthy twenty year old and that PVC had been deposited in or on Car No. 3298 as a result of the MBTA fire in 1975. "As long as the jury's verdict is supported by reasonable inferences, we will not substitute our interpretation of the facts for theirs." *Abraham* v. *Woburn, supra* at 730.

4. *The relationship between the decedent's comparative negligence and the breach of warranty claims.* Finally, the MBTA maintains that the jury's special finding that Michael Ferragamo was 35% negligent was tantamount to a finding of unreasonable use or misue thereby barring the plaintiff from recovery. Alternatively, according to the defendant, that recovery ought to

---

[13] On appeal the MBTA has not briefed or argued error in the admission of the experts' testimony. That issue therefore is deemed waived. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975). See *Wolfberg* v. *Hunter*, 385 Mass. 390, 391 n.1 (1982). The MBTA does argue that the plaintiff's experts did not have firsthand knowledge of what was in or near the car and that they did not conduct any tests or analyses of the car. The basis of the experts' opinions, however, goes to the weight of the evidence, not its sufficiency. The fact that the MBTA had an expert who said there was no PVC in Car No. 3298 in August, 1976, does not require the trial judge or this court to rule that the plaintiff's case, therefore, was insufficient as a mater of law. "Such testimony, with the weight and credibility of which we are not concerned, went no farther than to present an issue in the tribunal of fact." *Woronka* v. *Sewall*, 320 Mass. 362, 367 (1946).

be reduced in proportion to the decedent's degree of negligence. The MBTA's position directly contravenes the principles set forth in *Correia* v. *Firestone Tire & Rubber Co.*, 388 Mass. 342 (1983). There we held that "the plaintiff in a warranty action under G. L. c. 106, § 2-314, may not recover if it is found that, after discovering the product's defect and being made aware of its danger, he nevertheless proceeded unreasonably to make use of the product and was injured by it. No recovery by the plaintiff shall be diminished on account of any other conduct which might be deemed contributorily negligent." *Id.* at 357. Nowhere in the record is there the least indication that the decedent discovered the defect in Car No. 3298, was aware of its danger, yet proceeded unreasonably to dismantle the car. For the defect lay not in the mere fact that Car No. 3298 had been damaged in a fire — a fact observable, by all accounts, on inspection — but in the unseen presence of a potentially lethal chemical. Thus, the decedent's negligence did not meet the threshold such that his "conduct alone [would be] the proximate cause of his injuries, as a matter of law, and recovery . . . appropriately denied." *Id.* at 356.

We reverse the judgment which the judge entered notwithstanding the verdict on Counts II and IV, and remand the case to the Superior Court for the entry of judgment on those counts for the plaintiff. The judgment on Counts I and III is affirmed.

*So ordered.*