McHugh, J.
I. BACKGROUND
This is an action for medical malpractice in which plaintiff, the estate of Harold Skillman, claims that Riad Riskalla, M.D., an anesthesiologist, negligently treated the decedent at the Cambridge City Hospital on April 1, 1987, causing him significant injury. Dr. Riskalla defends, in part, by asserting that he was an employee of the Cambridge City Hospital at the time he treated the decedent and thus was a public employee immune from liability by virtue of G.L.c. 258, §1, et seq.
The case came on for trial before the undersigned, sitting without a jury, solely on the bifurcated question of defendant’s status as an employee of the Cambridge City Hospital. All parties agree that because Dr. Riskalla proffers his employee status as a defense, he has the burden of proving by a preponderance of the evidence that he was in fact an employee of the Cambridge City Hospital when he treated the decedent. See generally P. Liacos, et al., Handbook of Massachusetts Evidence 214 (1994).
Based on the evidence introduced during the course of the trial and the reasonable inferences I have drawn from that evidence, I make the following
II. FINDINGS OF FACT
Cambridge City Hospital (“the Hospital”) is an acute care hospital located in Cambridge, Massachusetts. The Hospital is owned and operated by the City of Cambridge. On or about June 1, 1985, the Hospital entered a contract with MGH Professional Services Corporation (“MGH”) under which MGH was to provide the Hospital with anesthesiology services.[1] The contract contained a detailed recitation of the duties and responsibilities of MGH and of those whom MGH designated to supply the services for which it was contractually responsible.
In pertinent part, the contract provided that anesthesiologists supplied by MGH would “provide anesthesia services ... to patients of the Hospital who require . . . anesthesia in connection with surgical procedures,” that those anesthesiologists would “also provide in-house physician coverage,” and would “also provide such additional administrative, teaching and research services as (were) described elsewhere in the [contract] or as might be agreed to from time to time by the MGH and the Hospital.” (Ex. 1, ¶1.)
The contract also provided that MGH would nominate to the Hospital all but one of the specific physicians to carry out the services MGH had contractually undertaken. Physicians nominated by MGH were subject to approval by the Hospital’s governing board, and upon approval, were to become members of the Hospital’s medical staff subject to all of the rights and responsibilities of active staff membership. Under the contract, the one physician MGH did not nominate was to be selected by the “Joint Harvard Medical School/Hospital Search Committee.” That physician was to serve as the Chief of the Hospital’s Anesthesiology Department.[2] The contract said that, once selected, the Chief of Anesthesiology would be appointed by the Hospital to serve on the Hospital’s medical staff and major professional committees, including the executive committee, the operating room committee, the intensive care committee and the search committees for key medical and other clinical staff. (Ex. 1, ¶2.)
Under the contract, the Chief of Anesthesiology was to have “responsibility for the overall standards of professional service and patient care rendered by the Department of Anesthesiology" and was to “provide active supervision to the other physicians whose services [were] to be provided by MGH” under the contract. Working with the appropriate administrative staff of the Hospital, the Chief of Anesthesiology was to “organize the department and exercise responsibil *91 ity for all nominations for appointments, recommendations for promotion, reappointments and dismissals in both physician and technical staffs in the department.” The Chief also was to insure that all departmental personnel had the appropriate licenses and had been approved “for membership on the Medical Staff of the Hospital.” (Ex. 1, ¶3.)
Beyond that, the Chief of Anesthesiology also was required by the contract to “monitor and review the quality of professional services and clinical judgments rendered by all members of the Department of Anesthesiology.” He or she also was required to insure that all professional services were rendered in accordance with the medical staff by-laws as well as all “rules and regulations and all policies of the Hospital. (Ex. 1, ¶5.) The Chief was responsible for scheduling all surgical procedures in the operating rooms. (Ex. 1, ¶6.)
For its part, the Hospital, under the contract, was required to provide physical space for use of the physicians supplied under the contract as well as support staff to enable those physicians to carry out their duties. (Ex. 1, paras. 7 and 8.) The contract provided that MGH was permitted to bill patients for certain services provided under the contract (Ex. 1, ¶9) and that the Hospital would pay MGH directly for other services, id. ¶10. MGH was required to maintain professional liability insurance for the individuals covered by the agreement, id. ¶11. Finally, the contract provided that
[t]he Anesthesiologists and [nurses supplied by MGH under the agreement] shall not be deemed to be employees of the Hospital, and the relationship between the Hospital and the Anesthesiologists and [nurses] shall be that of independent contractors.
Ex. 1, ¶1.
The initial term of the contract was from June 1, 1985, through May 30, 1987. The contract was amended on June 1, 1986, in ways that are not here material. As amended, the contract was in effect when defendant treated the decedent.
After the contract was executed, Philip W. Lebowitz, M.D. was appointed chief of the Department of Anesthesiology in accordance with the contractual provisions. Thereafter, he nominated staff physicians, including the defendant, Dr. Riskalla, for approval by the Hospital’s executive committee. For his services as the chief of the Department of Anesthesiology, Dr. Lebowitz received a salary in the form of checks from MGH. Dr. Lebowitz set the on-call schedules for all members of the Hospital’s Department of Anesthesiology. Dr. Lebowitz assigned members of the Department to specific surgical procedures and, in fact, assigned Dr. Riskalla to provide anesthesiology services to the decedent. He also supervised the continuing education of doctors who worked in the Anesthesiology Department. Continuing education services, among other things, included regular Thursday morning in-house education meetings.
Dr. Lebowitz recruited Dr. Riskalla to serve in the Hospital’s Anesthesiology Department. Dr. Riskalla began those duties soon after the contract was executed in June of 1985 and was in continuous service through and beyond April 1, 1987, when he treated the decedent. Dr. Riskalla previously had worked under Dr. Lebowitz while completing a fellowship in anesthesiology at the Cambridge Cily Hospital and, when nominated for the Hospital, had staff privileges at the Massachusetts General Hospital.
After Dr. Riskalla was nominated by Dr. Lebowitz, the Hospital’s executive committee approved him. When Dr. Riskalla began work, he was given a copy of the Hospital’s by-laws and rules and regulations and received the same orientation received by all other doctors granted privileges at the Hospital. Dr. Riskalla worked at the Hospital 60 to 70 hours per week, but also worked one day each week at the Massachusetts General Hospital. He viewed his work at the Massachusetts General Hospital as “moonlighting.”
While working at the Hospital, Dr. Riskalla was required to follow not only the Hospital’s by-laws but also the Hospital’s practice and procedure manual, a document that set forth in extensive detail many of the infection control and other procedures anesthesiologists were required to observe. He served on Hospital committees, including the intensive care committee, which set policy for intensive care patients, the operating room committee, which set policy for the operating rooms and procedures that took place there, the blood bank committee, which set policy for conducting transfusions and handling and storing blood and the anesthesiology committee, which was responsible for quality assurance and implementing sound procedures for anesthesiologists. Dr. Riskalla also filled in for Dr. Lebowitz on the Hospital’s executive committee when Dr. Lebowitz was absent.
Dr. Riskalla’s hours of work were set by Dr. Lebowitz. Dr. Riskalla had no private patients and treated only those patients that Dr. Lebowitz assigned to him. Dr. Lebowitz assigned Dr. Riskalla to treat the decedent and his first contact with him was on April 1, 1987 in the operating room as preparations for surgery began. Dr. Riskalla was required to accept the patients Dr. Lebowitz assigned and was not free to reject them according to his own desires. The operating rooms and the support personnel with whom Dr. Riskalla worked also were assigned to him by Dr. Lebowitz and, again, Dr. Riskalla was required to accept the assignments. Dr. Riskalla submitted bills for certain services directly to patients, and those bills were collected by MGH. For his services at the Hospital, he was paid a flat salary by MGH. That salary did not depend on Dr. Riskalla’s patient billings or his overall productivity. MGH also provided Dr. Riskalla with life insurance, fringe benefits and malpractice *92 coverage. MGH, however, promulgated no oral or written instructions or policies Dr. Riskalla was required to follow in the execution of his professional services. Those were provided instead by Dr. Lebowitz and the Hospital. Moreover, Dr. Riskalla did not interact directly with MGH support staff except insofar as the interaction concerned salary or billing matters.
Finally, Dr. Riskalla considered himself to be a full-time employee of the Hospital. Although he knew that a contract of some kind existed between MGH and the Hospital, he did not know the terms of the contract and no one ever asked him to subscribe to those terms.
III. CONCLUSIONS OF LAW
Whether a physician is an employee or an independent contractor is a question of fact to be decided after a review of all the evidence. See generally, e.g., Corsetti v. Stone Co., 396 Mass. 1, 11 (1985). The question turns, in the main, on the degree of control the putative employer exercises over the free and independent action of the putative employee. Id.; Kelley v. Rossi, 395 Mass. 659, 661 (1985); Smith v. Steinberg, 395 Mass. 666, 667 (1985); Chase v. Independent Practice Association, Inc., 31 Mass.App.Ct. 661, 665 (1991). The control in question is control of the details of the work the alleged employee performs or is required to perform, not simply control of broad, general conditions under which the employee works. See Kelly v. Rossi, supra, 395 Mass. at 662; St. Germaine v. Pendergast, 411 Mass. 615, 622-23 & n. 11 (1992).
Many Massachusetts cases, to be sure, have held that the skill, judgment, and discretion a physician is required to have and employ in order to carry out his duties successfully means that most physicians are independent contractors and not employees of anyone. See, e.g., Kelly v. Rossi, supra, 395 Mass. at 662; Smith v. Steinberg, supra, 395 Mass. at 667. Here, however, Dr. Riskalla clearly was an employee and not an independent contractor. His hours of work were set by Dr. Lebowitz, and he was not free to select them. The patients whom he treated were selected by Dr. Lebowitz, and he was not free to accept or reject those patients. The operating rooms where he performed his anesthesia services were selected by Dr. Lebowitz and he was required to accept them. He did bill patients directly for some of the services he rendered, but the bills were collected by MGH, and, like all other physicians performing under the contract, including Dr. Lebowitz himself, Dr. Riskalla was paid a flat salary. That salary was set in advance and was not dependent on his productivity during the course of any given period. In all respects, his work was governed and regulated by procedures Dr. Lebowitz dictated or that were set out in the provisions of the Hospital’s by-laws and regulations. Compare Smith v. Steinberg, supra, 395 Mass. at 669.
To be sure, the contract between MGH and the Hospital expressly provided that Dr. Riskalla and all others whom MGH supplied were to be considered as independent contractors and not as employees of the hospital. As between MGH and the Hospital, those provisions are undoubtedly valid regardless of any conclusions the facts would otherwise dictate.[3] Dr. Riskalla was not a party to the contract, however, and I have found that he did not agree to — indeed, that he did not know about — the contract’s terms. Those who are not parties to, and have not otherwise agreed to, the terms of a contract cannot be detrimentally bound to that contract’s terms. See, e.g., In re Morse Tool, Inc., 108 B.R. 384, 386 (D.Mass. 1989); cf., e.g., Ferragamo v. MBTA, 395 Mass. 581, 590-91 (1985).[4] Therefore, while the independent-contractor provisions of the contract are some evidence of the relationship between Dr. Riskalla and the Hospital, they are not determinative and, on the entire record, I am persuaded that they do not accurately state the true nature of the relationship between the two.
Employee status established, the question becomes whether Dr. Riskalla was an employee of MGH or of the Hospital. On this record, I am persuaded that he was an employee of the Hospital. Dr. Lebowitz was the primary source of control over Dr. Riskalla’s activities. Dr. Lebowitz, in turn, was the Chief of the Hospital’s Department of Anesthesiology, selected for that position by a joint Hospital/Harvard Medical School Committee and approved and appointed by the Hospital’s executive committee. Dr. Lebowitz was fully integrated into the Hospital’s executive committee, and played a role in and was governed by the Hospital’s operating regulations. Apart from sending salary checks to him, paying for his insurance, and collecting his bills, MGH had no contact with Dr. Riskalla nor did he have any contact with MGH. Instead, in all of his daily operations, while at the Hospital, Dr. Riskalla was required to act in accordance with the Hospital’s policies and with orders given to him by Dr. Lebowitz.
In the last analysis, the relationship between the Hospital and MGH resembled an arrangement in which an employer contracts with an independent service entity to recruit employees and to take care of all administrative functions in connection with the employee’s work, leaving the employer free to direct and control the work itself. See generally, e.g., Galloway’s Case, 354 Mass. 427, 429-30 (1968). Here, Dr. Riskalla was an employee of the Hospital. He was not an employee of MGH.
IV. ORDER
In light of the foregoing, judgment will enter declaring that on April 1, 1987, Riad Riskalla, M.D. was an employee of the Cambridge City Hospital and was a public employee within the meaning of G.L.c. 258, §1 et seq.

 MGH was a Massachusetts corporation formed in 1983 for the purpose of, among other things, providing medical services to the Massachusetts General Hospital and other hospitals.

 The evidence does not fully explain the origin or function of that committee, but, inferentially, it appears that the committee was designed to cany out a joint Harvard Medical School effort to locate and appoint a chief of anesthesia for the Hospital.

 That provision undoubtedly has sound economic roots and there is no reason why, as between themselves, MGH and the Hospital could not allocate the economic consequences of their relationship in virtually any way they choose. Cf. Shea v. Bay State Gas Co., 383 Mass. 218, 224 (1981).

 No suggestion has been made that plaintiff, also a non-party to the contract, was somehow a third-party beneficiary of the independent-contractor provision. See generally, e.g., Ayala v. Boston Housing Authority, 404 Mass. 689, 669-700 (1989).